**[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 569.]**

THE STATE OF OHIO, APPELLEE AND CROSS-APPELLANT, *v*. WILLIAMS,
APPELLANT AND CROSS-APPELLEE.

[Cite as *State v. Williams*, 1996-Ohio-91.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

1. Neither the felony-murder statute nor Ohio case law requires the intent to commit felony to precede the murder in order to find a defendant guilty of a felony-murder specification.

2. Whether a person has a "significant history of prior criminal convictions" under R.C. 2929.04(B)(5) is a question for the jury and is specifically outside the province of expert testimony.

(No. 94-846-Submitted—December 12, 1995—Decided February 21, 1996.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Trumbull County, No. 89-T-4210.

_____

{¶ 1} On the evening of August 15, 1988, defendant-appellant Andre R. Williams and Christopher Daniel assaulted and robbed George and Katherine Melnick after forcibly entering their home on Wick Street in Warren, Ohio. Williams beat Mr. and Mrs. Melnick, killing him and leaving her for dead. He also attempted to rape Mrs. Melnick.

{¶ 2} Between 9:00 p.m. and 10:00 p.m. on August 15, 1988, a neighbor of the Melnicks heard glass breaking and shortly thereafter heard Mrs. Melnick screaming "Oh, dear God," "Help me," "Please stop," and "No more." The screaming lasted for approximately one hour. No one called the police at that time. Two days later, another neighbor, concerned that she had not seen the Melnicks for two days, contacted the police. The investigating officers entered the Melnick home and found Mrs. Melnick lying under the kitchen table in a pool of her own

blood. Though she had been severely beaten, she was alive. The police found Mr. Melnick in a bedroom. He was dead, and according to the police report, had been for some time.

{¶ 3} Mrs. Melnick suffered from blunt force injuries including facial fractures. As a result of these injuries, surgeons removed her right eye. Her injuries also caused blindness in her remaining eye and diminished hearing. She has no memory of the attack. Her underpants, which she had been wearing before the attack, were found beside her on the floor. A test for the presence of semen was performed; the results were negative.

{¶ 4} An autopsy revealed that Mr. Melnick had been struck at least ten times and that he died as a result of multiple skull fractures and other "multiple and extensive blunt force injuries." Investigators found several items in the house that are believed to have been used in the attack on the Melnicks, including a lamp, a brick, an ax handle, and a piece of concrete block. The investigation revealed that several items were missing from the Melnick home, including a Magnavox VCR and Mrs. Melnick's purse, which had contained approximately $2,000 in $50 bills.

{¶ 5} The ensuing police investigation focused on Williams and Daniel. Henry Daniel, Jr., Daniel's brother, and Lisa Tobe, Henry, Jr.'s girlfriend, testified that they saw Williams and Daniel on the night of the murder at the house of Henry Daniel, Sr., Chris Daniel's father. Both appeared "hyper" and spent five to fifteen minutes together in the bathroom. Shortly thereafter, Henry, Jr. saw blood on the bathroom wall and on Williams's hand and Lisa noticed a rust-colored spot on Daniel's shirt. Williams and Daniel had in their possession a brown gym bag, a VCR, and a "nice amount" of money.

{¶ 6} The day after the murder, Williams bought a used car. He paid with nine $50 bills. Williams paid to have the car repainted with four $50 bills. The manager of the auto painting shop, who accepted payment from Williams, described him as so nervous that he needed help counting the money.

{¶ 7} Numerous acquaintances (Jennifer Gunther, Lance Owens, Henry Daniel, Jr., Ruben Gunther, and Mario Daniel, Chris Daniel's brother) testified that Williams admitted to and bragged about his involvement in an assault and robbery on an elderly couple on Wick Street. According to the testimony of these witnesses, Williams and Chris Daniel waited outside the couple's home until the woman finished a telephone call, and then broke in. Once inside, Chris hit the woman in the head with a brick while Williams attacked the man with a stick and a lamp. Williams said they got $1,800 (mostly in $50 bills) and a VCR from the robbery. Another witness, Estill Peterman, testified that he overheard an argument between Chris Daniel and Williams about which of them had used the lamp and ax handle to kill the man.

{¶ 8} With respect to the attempted rape of Mrs. Melnick, Williams told Lance Owens that just before he left the Melnick house, he was "on top of her" and was "trying to get some." Williams told Henry Daniel, Jr., "I raped the lady" and "I got some butt from the old lady." Ruben Gunther testified that Williams said he "got the butt from her." Mario Daniel heard Williams say he "tried to get some from the lady."

{¶ 9} During their investigation, the police found the Melnicks' VCR (it was identified by serial number) in a wooded area less than three-tenths of a mile from Henry Daniel, Sr.'s house. The police also found a brown nylon gym bag containing Mrs. Melnick's purse at the side of a road near Henry Daniel, Sr.'s house. Several hairs found in the purse were tested and compared to hair samples taken from Williams and Chris Daniel. The state's expert testified that one of the hairs was microscopically consistent with Daniel's hair and that another hair was similar to Williams's hair. The defense expert testified that he could not exclude the possibility that some of the hair taken from the purse was from Williams.

{¶ 10} When initially interviewed by police, Williams denied involvement in the incident and furnished an alibi. In the course of the interview, Williams asked

detectives, "Do you talk with judges?" When a detective asked what he meant, Williams then said, "Would it go easier on me if you talked to one?"

{¶ 11} The grand jury indicted Williams on three counts of aggravated felony-murder; each count was based on the separate underlying felonies of aggravated burglary, aggravated robbery, and rape. Each aggravated murder count alleged three R.C. 2929.04(A)(7) felony-murder death penalty specifications and one R.C. 2929.04(A)(5), "course of conduct" death penalty specification. The grand jury also indicted Williams for attempted aggravated murder (Count Four), aggravated burglary (Count Five), aggravated robbery (Count Six), and rape (Count Seven).

{¶ 12} The jury found Williams guilty on each aggravated murder count and guilty on all four death penalty specifications for each count. They also found him guilty of attempted aggravated murder, aggravated burglary, aggravated robbery and attempted rape. The jury found Williams not guilty of rape.

{¶ 13} During the penalty phase, the prosecution moved to dismiss the aggravated murder charges in Counts Two and Three. Thus, only Count One, aggravated murder based on the underlying felony of aggravated burglary, with four capital specifications, was considered during the penalty phase.

{¶ 14} During the sentencing phase, Williams presented witnesses who described his history and background. Frank C. Goodman, Director of Student Services in Special Education for Warren City Schools, testified that Williams was born on May 1, 1967, that he was placed in a developmentally handicapped program in the fourth grade, and that he had IQ scores of seventy-six in 1973, seventy-eight in 1978, and sixty-seven in 1983. Goodman also testified that Williams did poorly in school, repeated three grades, and stopped attending school when he was eighteen. According to an assistant principal from the high school Williams attended, Williams was suspended during ninth grade for being in a fight but otherwise had only minor disciplinary infractions.

{¶ 15} Emma Eggleston, whose son had grown up with Williams, testified that Williams had "always been a nice, little, young man." Williams's cousin described him as a "kind-hearted, helpful person," with a reputation as "a nice person." Madeline Vail, Williams's grandmother, who raised Williams, also testified. She stated that he was a "good and respectable" child, that he was an only child who never had the aid or assistance of a father, that he never gave her any particular problems with respect to discipline, respect, or control and that he was not violent.

{¶ 16} The parties stipulated that Williams had three misdemeanor convictions in his record: assault in February 1987, assault in December 1987, and shoplifting in February 1988.

{¶ 17} In an unsworn statement, Williams proclaimed his innocence. He stated that while he had done nothing to Mr. and Mrs. Melnick, he was sorry about what had happened to them. He questioned the propriety of the jury's determining whether he (or any other person) should be put to death, stating, "there's only one person that should judge somebody's life and that's God, the man upstairs."

{¶ 18} The jury recommended the death penalty, and the trial court sentenced Williams to the death penalty and prison terms. On appeal, the court of appeals ruled that "the evidence was insufficient to warrant a finding of guilty as to the aggravated murder count which was predicated on the underlying felony of rape/attempted rape," because the state had not proven that Williams intended to rape Mrs. Melnick at the time that he killed Mr. Melnick. The court of appeals also found that the trial judge erred in refusing to allow an attorney to express an opinion, as an expert, on whether Williams's prior criminal record constituted a "significant history of prior criminal convictions" under R.C. 2929.04(B)(5). The court of appeals affirmed the other convictions and the sentence of death with respect to the other three death-penalty specifications.

{¶ 19} The cause is now before this court pursuant to an appeal as of right and the state's cross-appeal.

_____

*Dennis Watkins,* Trumbull County Prosecuting Attorney, and *Patrick F. McCarthy,* Assistant Prosecuting Attorney, for appellee and cross-appellant.

*Thomas E. Zena* and *Gary L. Van Brocklin*, for appellant and cross-appellee.

_____

**WRIGHT, J.**

{¶ 20} We are required by R.C. 2929.05(A) to undertake a three-prong analysis in all death penalty cases. First, we must review each of the nine propositions of law raised by appellant. Second, we must independently review the record to determine whether the aggravating circumstances outweigh the mitigating factors. Finally, we must independently determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. For the reasons set forth below, we reverse the court of appeals in part, and affirm the convictions and sentence of death.

{¶ 21} In Proposition of Law II, appellant contends that the jury verdict was improper because it did not indicate that the jury unanimously found either that he was the principal offender in the murder or that he acted with prior calculation and design. We first note that appellant did not timely object to the verdict forms and thus waived all but plain error. Moreover, each of the verdict forms which the jury used and signed contained language, conforming to the statute, stating either that Williams was the principal offender, or that Williams had committed the murder with prior calculation and design. See R.C. 2929.04(A)(7); see *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744.

{¶ 22} Appellant also contends as part of Proposition of Law II that the trial court should have instructed the jury on the law of aiding and abetting. This

6

argument is without merit. As the person who performed every act constituting the aggravated murder, Williams was the principal offender. *State v. Sneed* (1992), 63 Ohio St.3d 3, 12, 584 N.E.2d 1160, 1168. It was therefore unnecessary for the court to instruct the jury on aiding and abetting.[1] We find that Proposition of Law II lacks merit.

**{¶ 23}** In Proposition of Law IX, appellant contends that the trial court erred because it did not instruct the jury on the lesser included offense of involuntary manslaughter. Involuntary manslaughter is a lesser included offense to aggravated murder. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph one of the syllabus. We find that the trial court did not err by refusing to instruct the jury on involuntary manslaughter because a charge on a "lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *Id.* at paragraph two of the syllabus.

**{¶ 24}** Here, under any reasonable view of the evidence, Williams was the principal actor in the purposeful killing of Mr. Melnick. If the defense had argued that Williams was a bystander or that the killing was not purposeful, an instruction on involuntary manslaughter would have been necessary. As it was, the defense contended that Williams was not present at the crime. Thus, on the evidence presented, the jury could not have found Williams not guilty of aggravated murder and guilty of involuntary manslaughter. Accordingly, the trial court's failure to instruct on involuntary manslaughter was not error.

---

1. Defense counsel failed to object at trial to either the instructions given by the judge or the verdict forms, thereby waiving all but plain error. To prove plain error, the defense must establish that, but for the asserted deficiency, "the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; Crim.R. 30(A); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Even assuming the instructions on this issue were defective, there was no plain error because the appellant has not established an outcome-determinative error with respect to Proposition of Law II.

{¶ 25} Furthermore, the injuries that Mr. Melnick suffered do not reasonably permit a finding that he was not killed purposefully. In *Thomas,* this court stated, "It is axiomatic that 'a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.'" *Id*., 40 Ohio St.3d at 217, 533 N.E.2d at 290, quoting *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 80, 381 N.E.2d 637, 640. Further, Williams told several people that he had beaten and robbed an elderly couple on Wick Street, giving details of the assault, and was overheard saying that he had killed the man. When speaking to Jennifer Gunther and Lance Owens, Williams actually demonstrated what he had done during the killing. Thus, in this case, "no reasonable jury could have both rejected a finding of guilty on the charged crime and returned a verdict of guilty on the lesser included offense of involuntary manslaughter." *State v. Shane* (1992), 63 Ohio St.3d 630, 633, 590 N.E.2d 272, 275. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 47-48, 630 N.E.2d 339, 349. We find that Proposition of Law IX lacks merit.

{¶ 26} In Proposition of Law V, appellant claims that a crime scene video and gruesome, inflammatory, and duplicative photographs prejudiced his right to a fair trial. The defense timely objected to the photographs. However, the defense did not timely object to the final edited version of the video and thus waived all but plain error with respect to that issue. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 27} Under Evid.R. 403 and 611(A), the admission of photographs is within the trial court's sound discretion. *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710, 726; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. Nonrepetitive photographs are admissible in capital cases, even if they are gruesome, when the probative value of each photograph outweighs the danger of material prejudice to the accused. *Id*. at paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 258,

513 N.E.2d 267, 273-274. In this case, the trial court did not abuse its discretion in admitting the objected-to photographs because none of them was repetitive and each photograph's probative value outweighed its prejudicial impact.

{¶ 28} Six of the objected-to photographs depicted separate injuries to Mr. Melnick's head. One of the other photographs depicted defensive-type wounds on Mr. Melnick's arm, and another showed leg wounds. Collectively, the photographs illustrated and corroborated the testimony of the coroner and the police officers. The photographs also depicted the nature and severity of the wounds and were thus probative of the killer's intent to kill. The trial court closely examined every proffered photograph and in fact excluded several. There was no abuse of discretion with respect to these photographs.

{¶ 29} As to the final edited version of the videotape, the defense failed to object at trial and thus waived all but plain error. Since nothing in the record suggests that the verdict would have clearly been otherwise if the videotape had not been admitted, there was no plain error. See *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 30} In Proposition of Law VIII, appellant makes three arguments with respect to the jury's finding that Williams was guilty of attempted rape. Appellant argues that the prosecutor asked an expert witness improper and prejudicial questions, that the trial court erred in denying defense counsel's Crim.R. 29 motion for acquittal, and that the trial court improperly charged the jury on the lesser included offense of attempted rape. We address each of these arguments separately.

{¶ 31} The prosecutor asked criminalist Dale L. Laux, "[I]n your experience, training and analysis, have you had an occasion to analyze rape kits in alledged [*sic*] rapes where there was no presence of semen or seminal fluid?" Though the question is arguably inartful, we find that the prosecutor's question in no way prejudiced Williams. In his answer, Laux expressed no opinion on the ultimate issue of whether a rape occurred. He merely observed that the absence of

semen does not prove that a rape did not occur. Further, Laux stated that he found "no physical evidence of a rape" on Mrs. Melnick. We reject the argument that the trial court erred by not excluding this question.

**{¶ 32}** The admission of expert testimony is within a trial court's discretion. *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 53, 446 N.E.2d 444, syllabus. An expert opinion is admissible when it "dispels a misconception common among lay persons." Evid.R. 702(A). Thus, because jurors might mistakenly ascribe greater significance to the absence of semen than warranted, the trial court exercised sound discretion in allowing Laux to answer.

**{¶ 33}** With respect to appellant's argument that the trial court improperly rejected the Crim.R. 29 motion for acquittal, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. We believe there was sufficient evidence of forcible sexual conduct in the record to allow a rational fact finder to find Williams guilty of attempted rape.

**{¶ 34}** Mrs. Melnick had been beaten and was found lying in a pool of her own blood, with her underwear on the floor beside her. She remembered nothing about the attack other than that she had been wearing underwear immediately before the attack. Lance Owens, Henry Daniel, Jr., Ruben Gunther and Mario Daniel, all testified that Williams had told them about raping Mrs. Melnick. Given this evidence and testimony, it is certainly possible that a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Thus, a jury could reasonably find that Williams attempted to rape Mrs. Melnick. See *State v. Scudder* (1994), 71 Ohio St.3d 263, 274-275, 643 N.E.2d 524, 533; *State v. Durr*

(1991), 58 Ohio St.3d 86, 92-93, 568 N.E.2d 674, 681-682. It should also be noted that Williams was acquitted of rape, rendering the Crim.R. 29 motion on that charge moot. We reject the argument that the trial judge improperly overruled the Crim.R. 29 motion.

{¶ 35} The court of appeals reversed appellant's conviction under Count Three, finding that "there was no evidence to suggest that Appellant formed his intent to rape Katherine Melnick prior to the time that he inflicted his fatal assault on George Melnick." In Proposition of Law I of its cross-appeal, the state contends that the court of appeals' finding resulted from an erroneous interpretation of *State v. Rojas* (1992), 64 Ohio St.3d 131, 592 N.E.2d 1376. The court of appeals stated:

"[*Rojas*] established that for purposes of R.C. 2903.01(B) and R.C. 2929.04(A)(7), it is necessary that evidence be presented from which a fact finder could reasonably conclude that the defendant formed his intent to commit the underlying felony prior to or during the commission of the acts which resulted in the murder victim's death."

{¶ 36} The state contends that the evidence "need not establish that an offender formed an intent to commit an attempted rape at or prior to the time" he committed the murder. Rather, R.C. 2929.04(A)(7) requires that the murder occur "while the offender was" committing a felony, attempting to commit a felony, or fleeing from the scene of a felony. The trial court correctly instructed the jury that the term "while" "means that the death must occur as part of acts leading up to, or occurring during, or immediately subsequent to the [relevant felony]."

{¶ 37} The *Rojas* decision itself supports the state's argument on this issue. Rojas did not rob his victim until hours after he had stabbed her and the case reflects that he did not stab her in order to rob her. *State v. Rojas*, 64 Ohio St.3d at 131-132, 592 N.E.2d at 1379. In this case, each of the crimes of which Williams was convicted occurred during one continuous incident. Accordingly, Williams should not be able to escape the felony-murder rule by claiming the rape was merely an

afterthought.  See *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510, 516.

**{¶ 38}** This court has had occasion to explain the meaning of the word "while" with respect to R.C. 2903.01(B), stating:

" 'The term "while" does not indicate *** that the killing must occur at the same instant as the attempted rape, or that the killing must have been caused by the attempt, but, rather, indicates that the killing must be directly associated with the attempted rape as part of one continuous occurrence[.] ***'  The evidence here showed that the murders were associated with the kidnappings, robbery, and rapes 'as part of one continuous occurrence ***." *** The evidence here showed that the murders were associated with the kidnappings, robbery, and rapes 'as part of one continuous occurrence.'" *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903, quoting *State v. Cooper* (1977), 52 Ohio St.2d 163, 179-180, 6 O.O.3d 377, 386, 370 N.E.2d 725, 736.

**{¶ 39}** In this case, the murder of Mr. Melnick was "associated" with the attempted rape of Mrs. Melnick "as part of one continuous occurrence."  As such, this case satisfies the *Cooey* test.  The facts are even stronger than those in *Rojas* and *Smith*, in which death sentences were affirmed, because there is no evidence which suggests a substantial passage of time between the assault on Mr. Melnick and the attempted rape of Mrs. Melnick.  Thus, we find that neither the felony-murder statute nor Ohio case law requires the intent to commit a felony to precede the murder in order to find a defendant guilty of a felony-murder specification.  In doing so, we reject the court of appeals' interpretation of R.C. 2903.01(B) and 2929.04(A)(7).

**{¶ 40}** Appellant's final argument within Proposition of Law VIII is that the trial court improperly instructed the jury on attempted rape.  We reject this contention because the crime of attempted rape, which is a lesser included offense of rape, was raised by the evidence.  See *State v. Thomas*, 40 Ohio St.3d 213, 533

N.E.2d 286, paragraph two of the syllabus. Moreover, the defense requested an instruction on attempted rape, and cannot now complain of any error so induced. See Crim.R. 30(A); *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408, 422.

{¶ 41} In Proposition of Law I, appellant argues that the court of appeals lacked the authority to affirm his death sentence by reweighing the evidence because the court of appeals found that some mitigating evidence had been improperly excluded by the trial court. We reject this argument.

{¶ 42} Independent appellate reweighing has been upheld in varied situations and "does not contravene the role of the jury in the penalty proceeding." *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, paragraph two of the syllabus; see *State v. Combs* (1991), 62 Ohio St.3d 278, 286, 581 N.E.2d 1071, 1079; *State v. Landrum*, 53 Ohio St.3d at 115, 559 N.E.2d at 721. Rather, in a death penalty case, the true purpose of independent appellate review is to provide "a procedural safeguard against the arbitrary imposition of the death penalty.*"* *Holloway*, 38 Ohio St.3d 239, 527 N.E.2d 831, paragraph two of the syllabus. Appellate reweighing requires the court to consider proffered evidence that the jury was erroneously not allowed to consider. Thus, any deficiency in the lower court's decision can be cured by the reviewing court's independent sentence assessment. *State v. Simko* (1994), 71 Ohio St.3d 483, 493, 644 N.E.2d 345, 354; *State v. Green* (1993), 66 Ohio St.3d 141, 149, 609 N.E.2d 1253, 1260. Accordingly we reject Proposition of Law I.

{¶ 43} The testimony that the trial court excluded was that of attorney R. Scott Krichbaum. The defense wanted him to testify, as an expert, regarding whether Williams lacked a "significant history of prior criminal convictions" pursuant to R.C. 2929.04(B)(5). (The parties had stipulated to Williams's criminal record.) The court of appeals held that excluding the proffered testimony was error. We reverse that holding.

**{¶ 44}** Whether an accused's criminal history is "significant" under R.C. 2929.04(B)(5) is a jury question. The weight to be given such a conclusion is also a question for the jury. The trial court simply exercised its discretion "to refuse to admit the testimony of an expert witness on an ultimate issue where such testimony is not essential to the jury's understanding of the issue and the jury is capable of coming to a correct conclusion without it." *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881, paragraph three of the syllabus. As there is no legal standard to determine the "lack of a significant history of prior criminal convictions," the significance of Williams's criminal history under R.C. 2929.04(B)(5) does not involve professional matters "requiring special study, experience or observation not within the common knowledge of laymen[.]" *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 40 O.O.2d 87, 228 N.E.2d 304, paragraph one of the syllabus.

**{¶ 45}** The jury knew of Williams's criminal record and was properly instructed with respect to mitigating factors by the trial judge. The jury thus had all the information necessary to properly evaluate this asserted mitigating factor. "Expert" testimony on such an issue would have been improper. We find that whether a person has a "significant history of prior criminal convictions" under R.C. 2929.04(B)(5) is a question for the jury and is specifically outside the province of expert testimony.

**{¶ 46}** In Proposition of Law III, appellant contends that the trial court erred because it did not merge the four separate death penalty specifications charged against Williams for sentencing purposes. As the defense failed to object at trial, it waived all but plain error. Thus, the defense must, but did not, establish that "the outcome of the trial clearly would have been otherwise" if the asserted error had not occurred. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Moreover, Williams waived the issue by not

raising it before the court of appeals. *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 691. Despite the waiver of this issue, we will address it briefly.

**{¶ 47}** The defense's argument is based primarily on this court's decision in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. In *Jenkins,* the defendant was charged with five specifications, three of which alleged that he committed aggravated murder (1) to escape apprehension for aggravated robbery; (2) while committing or fleeing after committing aggravated robbery; and (3) while committing or fleeing after committing kidnapping. This court held that specification (1) unnecessarily duplicated (2), and that specification (2) unnecessarily duplicated (3). The specifications were duplicative because they were part of an indivisible course of conduct. Accordingly, the specifications were merged. *Id*. at 194-195, 15 OBR at 337-340, 463 N.E.2d at 292-295.

**{¶ 48}** In this case, the felony-murder and multiple murder specifications represent distinct and separate aggravating circumstances and therefore are not duplicative. See *State v. Frazier* (1991), 61 Ohio St.3d 247, 256, 574 N.E.2d 483, 490-491. Aggravated burglary and aggravated robbery are separate offenses and constitute separate aggravating circumstances because they do not arise from the same act. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 611, 605 N.E.2d 916, 929; *State v. Barnes* (1986), 25 Ohio St.3d 203, 207, 25 OBR 266, 269-270, 495 N.E.2d 922, 925. Under the facts of this case, attempted rape is also a separate offense and aggravating circumstance because it involves separate offense elements and an animus separate from the aggravated burglary and aggravated robbery. Accordingly, even in the absence of waiver, we would reject Proposition of Law III because the death penalty specifications were not duplicative.

**{¶ 49}** In Proposition of Law IV, appellant argues that the prosecutor improperly referred to Williams's failure to testify at the sentencing hearing. During his closing argument at the sentencing hearing the prosecutor said, "Finally

the last person presented in the penalty phase of this case was the Defendant. ***
Every witness who's testified as to what happened in this case took that witness
stand under oath and told you what happened. Every witness except one. The
Defendant." The setting of the comments and the context indicate that the
prosecutor's comments were directed to the unsworn statement made by Williams
at the sentencing hearing. However poorly crafted the comments may have been,
they were not directed to Williams's failure to testify at trial. Consequently, the
prosecutor's comments were not improper and we reject Proposition of Law IV.
*State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph two of the
syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206-207, 616 N.E.2d 921, 926;
*State v. Coleman* (1989), 45 Ohio St.3d 298, 301, 544 N.E.2d 622, 627.

{¶ 50} In Proposition of Law VI, appellant argues that when the trial court
reviewed the jury's recommendation for the death penalty it improperly considered
the facts and circumstances of the case itself, as what the appellant terms "a non-
statutory aggravating circumstance." To the contrary, the trial court accurately
identified, and the jury found, four specified aggravating circumstances. When a
court so finds, there is a presumption that it relied only on those specified
aggravating circumstances and that it did not rely on nonstatutory aggravating
circumstances. *State v. Rojas*, 64 Ohio St.3d at 142, 592 N.E.2d at 1386; *State v.
Wiles* (1991), 59 Ohio St.3d 71, 89, 571 N.E.2d 97, 120. We find that the trial judge
did not improperly rely on nonstatutory aggravating factors and accordingly reject
Proposition of Law VI.

{¶ 51} In Proposition of Law VII, appellant challenges the constitutionality
of Ohio's death penalty statute. This challenge is summarily rejected. *State v.
Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Jenkins*, 15
Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264.

{¶ 52} We find that the evidence supports a finding of the aggravating
circumstances charged against Williams beyond a reasonable doubt. We therefore

16

agree with the jury that Williams killed Mr. Melnick while committing aggravated burglary, aggravated robbery, and attempted rape, R.C. 2929.04(A)(7), and as a "course of conduct" with intent to kill two or more, R.C. 2929.04(A)(5).

{¶ 53} Some mitigating factors are present in this case. Williams has a low IQ, which was recognized by authorities who attempted to provide help and assistance. However, no evidence at trial established that Williams's low IQ caused him to lack the "substantial capacity to appreciate the criminality of his conduct" or "conform" to the law. Williams was raised by a grandmother who loved, supported and nurtured him. He was twenty-one at the time of the offense.

{¶ 54} We believe that Williams can also qualify for the R.C. 2929.04(B)(5) mitigating factor, "lack of a significant history of prior criminal convictions[.]" His two 1987 assault convictions and his 1988 shoplifting conviction diminish the significance of this mitigating factor. With regard to the R.C. 2929.04(B)(6) mitigating factor, we find that since Williams personally killed Mr. Melnick, he fails to qualify for the R.C. 2929.04(B)(6) mitigating factor. None of the mitigating factors in R.C. 2929.04(B)(1) and (2) appear applicable, since no evidence suggests that the victims induced the offense or that Williams acted under "duress, coercion, or strong provocation." No "other factors," R.C. 2929.04(B)(7), are applicable. While we recognize that some mitigating factors are relevant to this case, we find that the aggravating circumstances outweigh the mitigating factors.

{¶ 55} The sentence of death is proportionate when compared with similar felony-murder cases. See *State v. Slagle*, 65 Ohio St.3d 597, 605 N.E.2d 916; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; *State v. Rojas*, 64 Ohio St.3d 131, 592 N.E.2d 1376; *State v. Smith*, 61 Ohio St.3d 284, 574 N.E.2d 510; *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293; *State v. Holloway*, 38 Ohio St.3d 239, 527 N.E.2d 831; *State v. Barnes*, 25 Ohio St.3d 203, 25 OBR 266, 495 N.E.2d 922. In addition, the death sentence in this case is proportionate when compared with prior "course of conduct" murder cases. See *State v. Dunlap* (1995), 73 Ohio

St.3d 308, 652 N.E.2d 988; *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082; *State v. Grant* (1993), 67 Ohio St.3d 465, 620 N.E.2d 50; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; and *State v. Combs*, 62 Ohio St.3d 278, 581 N.E.2d 1071, including cases cited at 294, 581 N.E.2d at 1084.

**{¶ 56}** We affirm the convictions and death penalty sentence and reverse on the cross-appeal.

*Judgment affirmed in part*
*and reversed in part.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

———————————