OPINION
Kelly M. Turner appeals from his conviction for improperly discharging a firearm at or into a habitation or school in violation of R.C. 2923.161
after a bench trial.
Jerry Worthy and Betty Mitchell reside at 2503 Arlene Avenue with her three children. Betty shares a son, Timothy Mitchell, with Turner, who resides with his wife and children six blocks away. Timothy is ten years old and often spends time at Turner's home. There had never been any trouble between the two families.
On August 24, 2000, at approximately 9:30 p.m., Jerry Worthy went to Turner's home and picked up Timothy. Later that night, at approximately 11:30 p.m., Betty came home from work and was preparing to take a shower when the phone rang. Jerry answered the phone and it was Turner. Turner, drunk and aggressive, began shouting at Jerry asking, "Why'd your bitch ass disrespect my house, * * *I beat yo' punk ass." Betty heard the yelling and after finding out it was Turner, she hung up the phone.
Betty called Dawn Turner, Turner's wife to find out why Turner was so upset. Dawn did not know what she was talking about, so Betty went to Turner's home to find out what happened. When she arrived, Turner was angry and upset and was wearing a bulletproof vest. Turner told Betty that he was going to "put [Jerry] to sleep." Betty took this to mean that Turner would kill or shoot Jerry. Id. Betty then returned home.
At approximately midnight, Turner showed up with two other men at the Arlene Avenue home. Turner admitted that he was there to fight. Turner got out of the truck wearing his bulletproof vest, with a gun in each hand and ordered Jerry to come out of the house saying, "Come on out here now. Now what you gonna do?" Jerry came to the door and Betty grabbed the kids and went to the back of the house. Turner yelled, "Bitch" and "Ho," and told Jerry he was going to kick his ass. Jerry then saw an infrared light on his chest and ducked behind the door. A shot rang out and then Jerry heard rapid firing. Worthy told Betty to call 9-1-1. A few minutes later, Turner called the residence while the police were still there, asking Betty why she called the police. Turner told Betty, "Fuck the police. I'll shoot them too."
Bullet holes were found throughout the Suburban, which was parked in the driveway directly in front of the house. A bullet hole was also discovered in the wall of their attached garage. Specifically, Betty Mitchell testified she saw the bullet hole in the front of her house after Turner finished shooting and the hole had not been there before. (Tr. 90).
Officer Jeffrey Holmes of the Dayton Police Department responded to the Arlene Avenue address on the report of the shooting. Holmes is an evidence technician and he collected evidence for the prosecutor. Holmes observed that there were three vehicles parked in the driveway close to the attached garage. He noticed several bullet holes in a Chevrolet Suburban which was parked in the middle of the other two vehicles. He also noticed there were seven 9 millimeter shell casings at the end of the driveway and in the street and eight 9 millimeter shell casings immediately to the rear of the Chevrolet Suburban.
On closer examination, Holmes observed ten bullet holes in the rear of the Suburban with one of the holes being through the back window. He also observed two bullet holes on the right side of the vehicle toward the rear. Holmes recovered one bullet from inside the Suburban. Holmes also discovered a bullet hole in the front of the Arlene residence near the garage. Holmes said he did not recover the bullet that struck the house because it would have involved significant damage to the house. (Tr. 16, 17).
Holmes took a number of photographs which were introduced into evidence during his testimony. Although Holmes testified the casings indicated fifteen rounds were fired, he could only account for thirteen of the shots fired. (Tr. 63).
Gary Ware, an investigator with the Montgomery County Prosecutor's Office, testified that he went to the Arlene residence on March 5, 2001 and retrieved three bullets from Jerry Worthy. Worthy told Ware he retrieved two bullets from the Suburban and one from inside the garage wall.
Jerry Worthy testified he recovered a bullet from inside the garage wall a few days after the shooting and recovered two other bullets from a speaker box at the rear of his Suburban vehicle. He said he gave these bullets to Gary Ware in March 2001. Chris Montura, a Firearm and Toolmark Examiner with the Montgomery County Crime Laboratory testified he examined the shell casings and bullets and determined that two different 9 millimeter weapons were used by the shooter. (Tr. 189). Montura also determined that eight bullets were fired from one weapon and seven from the other.
Turner admitted shooting at Worthy's Suburban. He testified he was angry at Worthy because he had threatened him earlier in the evening with a shotgun. (Tr. 261). He testified he wasn't shooting at Turner's house because he would never shoot at a house with his ten year old son inside at the time. (Tr. 261). Turner testified that he stumbled when he approached Turner's house to talk to him and one of his guns could have accidentally discharged.
The trial court overruled acquittals motions made by the defendant at the conclusion of the State's case and at the conclusion of the trial.
The trial court found Turner guilty of the charge and offered the following explanation:
 I conclude that the State of Ohio proved beyond a reasonable doubt that the Defendant, Kelly Turner, fired two semi-automatic weapons at the Suburban and that one of the bullets ricocheted off the Suburban and into the garage.
State did not prove beyond a reasonable doubt that Mr. Turner directly fired at or into the house. The evidence of what occurred immediately after Mr. Turner stumbled is not sufficient for me to make a determination, especially since the garage bullet as I will — I will call it — that the hole created by that bullet is — is inconsistent with a direct shot into the garage.
As an aside, I do believe that Mr. Worthy did something to cause Mr. Turner to act the way that he did. However, Mr. Worthy's conduct has nothing whatsoever to do with whether or not Mr. Turner is guilty of the charge.
And as a further aside, anything that occurred thereafter is certainly not of any importance.
The issue, therefore, is this: Is Mr. Turner Guilty of Ohio Revised Code Section 2923.161 based upon firing at and into the Suburban and one of the bullets ricocheting off the Suburban and into the garage?
I note at this point that Mr. Turner's purpose or intent is not the issue. I know full well that Mr. Turner did not intend to hit the garage and it was certainly not his intent or purpose to hurt anyone inside that home.
That doesn't in any way, Mr. Turner, excuse what you did. But I know it was not your intent or purpose to hurt anyone.
And what I've been struggling with all day, quite frankly, is the definition of knowingly which is found at Ohio Revised Code 2901.22(B):
 "A person acts knowingly regardless of his purpose when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
And I've struggled with that and, quite frankly, I did some quick research and there's really no case I can find out there that's exactly on point here.
But I conclude, given the — the totality of the circumstances, and given how the bullets were sprayed about, and given the fact that Mr. Turner, as reflected by Exhibits "C", "D", and "E" which shows where the — the casings were found by the Evidence Technician, that he was backing away from the Suburban as he continued to fire at the Suburban.
Now, Mr. Turner did act knowingly because he had to be aware that his conduct, i.e., spraying bullets towards the subur — towards the Suburban would probably cause one or more of the bullets to strike the garage with the garage being directly in front of the Suburban.
So, I've reached the conclusion that Mr. Turner, though it was not his purpose or intent to strike the garag — the garage, did knowingly strike the garage because he had to be aware that his conduct, i.e., again spraying the bullets towards the Suburban, would probably cause one or more of the bullets to strike the garage.
Therefore, Mr. Turner, I — I have to find you Guilty of the offense of a violation of Ohio Revised Code Section 2923.161.
Turner contends in his first assignment of error that the trial court erred in failing to grant his acquittal motions interposed at the conclusion of the State's case and at the conclusion of all the evidence.
Turner argues that the physical evidence demonstrated that he intended to shoot at Worthy's Suburban automobile and that he did not knowingly shoot at Worthy's house. Turner argues that it would be absurd to believe that he knowingly would expose his son to injury or death by shooting at Worthy's house.
A Crim. R. 29(A) motion for acquittal tests the sufficiency of the evidence presented at trial. See, State v. Williams (1996),74 Ohio St.3d 569, 576, 660 N.E.2d 724. Under Crim.R. 29, a trial court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. Furthermore, a trial court must view the evidence in a light most favorable to the State when considering a motion for acquittal. State v. Evans (1992),63 Ohio St.3d 231, 248.
An appellate court undertakes de novo review of the trial court's decision on a Crim.R. 29(A) motion and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
In a non-jury trial, however, the defendant's plea of not guilty serves as a motion for a judgment of acquittal and obviates the necessity of renewing a Rule 29 motion at the close of all the evidence.
This Court addressed facts somewhat similar under a Crim.R. 29 standard in State v. Breeding (January 26, 2001), Clark App. No. 00-CA-0008, unreported. In Breeding, the State presented evidence that Brian Cummins remembered Diana Donaldson going through the door from the garage into her house when Darrell Breeding fired a shot, and that the bullet struck the door. Breeding told Sgt. Ayres that he was upset at finding Donaldson with another man and admitted that he fired a shot at Donaldson to frighten her as she ran through the door from the garage into her house. In addition, police discovered a bullet hole in that door and the spent bullet on the other side of that door, just inside the house. After viewing this evidence in a light most favorable to the State, the trial court overruled the Crim. R. 29 motion and this Court affirmed its decision.
In State v. Powell (September 15, 1998), Lake County App. Case No. 97-L-130, unreported, the Court of Appeals reversed the defendant's conviction on manifest weight grounds under the following stated facts:
 On the afternoon of October 31, 1996, appellant, after being pressured by two friends, fired four shots from a nine millimeter semi-automatic hand gun in the general direction of 69 Nebraska Street, Painesville, Ohio, a residential home divided into two apartments. Three of the rounds hit the side of a Toyota parked in front of the residence; the fourth round pierced the front door of the residence before exiting through a side wall and lodging itself in the side of a neighboring house. There was a pause of two or three seconds between the first shot and the second shot, but the final three shots were fired in rapid fashion.
Appellant testified at his bench trial that his purpose in firing the weapon was to shoot out the tires of the Toyota parked in front of the residence. He had only fired that particular weapon on one prior occasion. He claimed that the weapon had more of a recoil than he expected causing each successive shot to go higher than the previous one. As a result, the first three shots hit the Toyota at increasingly higher levels while the fourth shot missed the vehicle altogether and hit the front door of the residence which was directly in line with the vehicle. He stated that his intention was only to shoot at the automobile.
After firing the shots, appellant hid the gun and walked back to his friends' house down the street. In the evening, the police arrived and arrested both of the appellant's friends for the shootings. Appellant was not a suspect at that time. After the police left, appellant was told that his friends would have to be released within seventy-two (72) hours if the police were unable to locate the weapon. Appellant responded by retrieving the gun and stealing a car in an attempt to remove the gun from Lake County. However, the car ran out of gas on State Route 2 in Eastlake and appellant was subsequently arrested.
Appellant was indicted by the Lake County Grand Jury on December 26, 1996. Appellant entered a not guilty plea to all counts and the matter proceeded to a bench trial on April 29, 1997. At trial, appellant admitted to carrying a concealed weapon and that he stole a car, but denied improperly discharging a firearm into a habitation or school. Appellant was found guilty on all counts and sentenced to prison for two years on the improper discharging of a firearm count; one year on the concealed weapon count; and one year on the grand theft of an automobile count. All sentences were to run concurrently. Additionally, appellant was sentenced to a mandatory three-year term for the firearm specification, to run prior to and consecutive to the other sentences.
The Lake County Court of Appeals further observed:
 In the case sub judice, it is appellant's contention that he did not "knowingly" fire the weapon at or into an occupied structure. Instead, he intended to shoot at the automobile parked in front of the residence. By accident, and due to the recoil of the gun, one of the bullets strayed from his target and hit the house. In essence, appellant argues that his actions were, at most, done in a "reckless" manner which, on a scale of culpability, is something less than "knowingly."
* * * *
 In the case at bar, a review of the testimony supports appellant's assertion that he did not knowingly fire the weapon at or into the occupied structure. He specifically stated that he was shooting at the car. In a prior statement given to police, he maintained that he was shooting at the car. Immediately after the incident, he told a witness for the prosecution that he was shooting at the car. The state failed to produce a single witness to testify otherwise.
 Additionally, appellant testified that the recoil from firing the nine millimeter weapon in rapid fashion caused the bullet to stray above the roof of the Toyota. This testimony was supported by Detective Robert Eden of the Eastlake Police Department who gave his expert opinion that a nine millimeter semi-automatic weapon does, in fact, have a recoil causing the weapon to rise as each round is ejected from the barrel. This would account for the fourth bullet hitting the house at a higher trajectory than the first three bullets.
* * * *
 While all of the foregoing items are undisputed facts, none of these facts contradict appellant's claim that he was aiming at the Toyota. While it was certainly possible that appellant would miss the car and hit the house, it was not probable from appellant's viewpoint. It does not matter whether the court, the police, or a third party believed that it was probable that appellant would miss the car and hit the house. The relevant inquiry is limited to whether appellant was aware that his conduct would probably cause a certain result; to wit, striking the house with a bullet. This question must be answered in the negative. Thus, the trial court's decision that appellant acted knowingly rather than recklessly was against the manifest weight of the evidence.
Appellant was convicted of violating R.C. 2923.161(A), which provides:
 "No person, without privilege to do so, shall knowingly discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual or a school."
The element of "knowingly" is defined in R.C. 2901.22(B) as follows:
 "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
(Emphasis ours)
We have carefully reviewed the evidence presented in the trial court including the photographs taken of the scene. The physical evidence demonstrates that Turner fired several shots from the end of the driveway toward the Suburban which was parked next to the garage area of the residence. A rational trier of fact could conclude from this physical evidence, despite Turner's protestations to the contrary, that he was aware he would probably hit the garage area with his gun if his shots ricocheted off the vehicle or missed the vehicle.
The evidence is also not against the manifest weight of the evidence. We cannot say the trial court lost its way and created a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997), 78 Ohio St.3d 380, at 387.
Accordingly, the assignments of error are overruled and the judgment of the trial court will be affirmed.
GRADY, J., and YOUNG, J., concur.