[Cite as *State v. George*, 2021-Ohio-2708.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-20-1044

    Appellee                                Trial Court No.  CR0201902503

v.

Alejandro Palmer George                **DECISION AND JUDGMENT**

    Appellant                               Decided:  August 6, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**DUHART, J.**

{¶ 1}  This is a delayed appeal filed by appellant, Alejandro Palmer George, from

the December 23, 2019 judgment of the Lucas County Court of Common Pleas.  For the

reasons that follow, we affirm.

{¶ 2}  Appellant sets forth two assignments of error:

> I. The trial court erred in denying appellant's Rule 29 motion.

II. The jury's verdict was against the manifest weight of the evidence presented at trial.

## Background

{¶ 3} On August 28, 2019, appellant was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree. The charge arose from an incident which occurred on August 20, 2019, between appellant and his then-girlfriend ("the victim"). Appellant pled not guilty. The case proceeded to trial.

## Victim

{¶ 4} The victim testified to the following. She and appellant were in an on-and-off relationship for over four years. She had a baby, in July 2019, who she believed appellant had fathered. She later discovered appellant was not the father of her baby.

{¶ 5} On August 19, 2019, after appellant got home from work, the couple drank beer and watched a movie in the living room of the victim's apartment, with the baby asleep in a swing next to the couch. Appellant started to get drunk and call the victim names. At about midnight on August 20, 2019, appellant took the victim's phone and found messages between the victim and her friend. The messages indicated the victim kissed or made out with one of appellant's friends, when the victim and appellant were broken up.

{¶ 6} Over the next four hours, appellant slapped the victim in her face, punched her in the ribs, kicked her in her stomach and back, and choked or strangled her until she could not breathe, she urinated in her pants and started to see stars. The baby was asleep

2.

in the swing most of the time, but at one point the baby woke up. While the victim was holding the baby, appellant hit the victim in the face. He repeatedly said he had to leave the state, he should quit his job and drive her out to the middle of nowhere and dismember her.

{¶ 7} At about 4:00 a.m., appellant started to get ready for work, and took a shower. The victim grabbed her baby and ran out of her apartment. Appellant had the victim's phone and car keys, so she went inside another apartment building. A resident then drove the victim and her baby to a relative's house. The victim felt like her ribs were broken and she was having difficulty breathing, so she was taken to the hospital where she received treatment and was admitted overnight.

{¶ 8} The police were called and the victim told an officer what happened. With respect to her injuries, the victim described her face "was completely deformed and swollen," she had bruises and rug burns, she had "busted blood vessels" in her eye so it was red on the inside, and she had two black eyes. The victim's injuries lasted over a month, but she did not have further medical treatment. The victim moved to Texas because she was scared of appellant, and she has had no contact with him.

### Officer

{¶ 9} The responding officer testified he was wearing a body camera when he saw the victim at the hospital and she was upset and very distressed. The officer observed "bruising about the head, neck and on [the victim's] arms." The victim reported

3.

that appellant hit, slapped and strangled her, and took her car keys and phone. While appellant was in the bathroom showering, the victim grabbed her baby and fled to an adjoining building. Someone gave the victim a ride to a relative's nearby home.

### Nurse

{¶ 10} The emergency room nurse testified she is a certified sexual assault nurse examiner ("SANE") and took a three-day seminar on strangulation. The nurse conducted a strangulation examination on the victim, which included an event history. In the history, the victim reported her child's father/boyfriend was intoxicated and hit and strangled her, and took her phone and keys/car. The victim was tearful.

{¶ 11} The nurse prepared a body map indicating injuries on the victim's neck, head, face, eyes and left ear. The victim had a circular pattern of bruising on her neck, which would be indicative of a thumb or finger pressed against her neck. And, the victim had bruising and petechiae, due to restriction of blood flow. Petechiae are tiny purple dots that look like bruises. The nurse noted the victim's right eye had a subconjunctive hemorrhage, which is "the redness to the white of the eye," caused by "[a] build up of pressure in the brain from blood not being able to flow back." Petechiae and a subconjunctive hemorrhage are signs of strangulation. On cross-examination, the nurse acknowledged petechiae can occur due to vomiting.

{¶ 12} The victim also had redness and pain to the left rib area, bruising and abrasions on her arms and bruising on her feet. The medical records set forth the victim's primary diagnosis as "Victim of physical assault. Head injury with loss of consciousness.

4.

Manual strangulation." DNA evidence from the victim's neck was collected in a strangulation kit.

## Scientist

{¶ 13} An Ohio Bureau of Criminal Investigation ("BCI") forensic scientist testified she conducted DNA analysis on submitted items and generated a report which set forth her findings and conclusions. The BCI scientist detected male DNA on items from the victim's strangulation kit, and on one item, appellant and his paternal male relatives could not be excluded as the source of the DNA profile. The BCI scientist could not say how or when the DNA was deposited.

## Detective

{¶ 14} A detective with the domestic violence unit testified she met with the victim at the hospital. The victim had bruises developing around her eyes, she had petechiae, and she was emotional and crying. After speaking with the victim, the detective went to the victim's apartment complex and located the victim's car and attempted to locate the person who drove the victim to her relative's house, but was unable to do so.

{¶ 15} The detective met with appellant at the police station. Appellant appeared fine, he had no visible injuries and he had the victim's keys in his pocket. Appellant was interviewed about the domestic violence incident but he said he did not have much of a recollection, he had been inebriated and had some spots in his memory. The detective took DNA swabs from appellant in order to have a DNA standard for the strangulation

5.

kit.  The detective stated the DNA test conducted by the BCI scientist showed there was a DNA deposit from appellant on the victim's throat.

**Appellant**

{¶ 16} Appellant testified to the following.  He had been living with the victim, on and off, for about a month to a month and a half before the incident.  On the night of August 19, 2019, he and the victim were drinking and started watching a movie at 11:00 p.m.  On August 20, 2019, just past midnight, the victim's phone vibrated and lit up.  Appellant asked if he could see the phone and the victim handed it to him.  Appellant "seen it was a guy, so it sparked my curiosity."  Appellant went outside with the victim's phone and looked through "Facebook Messenger, text, calls, [and] gallery for over an hour."

{¶ 17} When appellant returned to the apartment, the victim was resting on the couch on her back, and appellant held her phone "over her face as she was lying down, and I asked her what does that say. * * * She says it says we made out.  We, meaning [the victim] and [appellant's friend]."  Appellant said he dropped the phone of her face from about ten inches to a foot, with "[n]o, no velocity."  Appellant then slapped the victim across the face.  By this time it was one o'clock or later, appellant recalled, and "[t]here was no arguing.  There was no yelling.  No.  Just, just talking.  I was talking."

{¶ 18} Appellant saw another text between the victim and her friend which said the victim had sex with another guy, so appellant asked the victim about the text.  The victim said it did not happen, and appellant "slapped her for the second time * * * [he]

6.

slapped her a total of five times." At one point the baby cried so appellant picked up the baby and handed her to the victim so the baby could be fed. After the baby fell asleep, he put her back in her swing. Then, appellant was on his knees in front of the victim and "holding her * * * her abdominal * * * and hugging her and just asking why, why she cheated."

{¶ 19} Appellant and the victim sat of the couch and talked for over an hour, when "I looked to my left. I seen the stove, seen the time[,] it said four o'clock. I knew I had to start getting ready for work, and that's what I did." Appellant put the victim's phone by the television and took a shower. Appellant's mother picked him up and drove him to work. Appellant only had his own keys with him. Appellant said he was not trying to hurt the victim when he slapped her, he "was trying to get the truth out."

{¶ 20} On cross-examination, appellant said throughout his on-and-off relationship with the victim, he did not see other people when he and the victim were not together. He denied that he had the victim's keys when he went to the police station. Appellant recognized there might be some holes in his memory, but he remembers the events from August 20, 2019 better because "[a]s time goes on * * * you regather your thoughts." He remembers slapping the victim with an open hand five times, hard, not lightly, and holding her tightly. He did not strangle her. Appellant believes the victim was vomiting on August 20, 2019, which potentially could have caused the petechial hemorrhaging. Appellant admitted he "[c]onversated and argued" with the victim on August 20, 2019, and the victim called herself names like "dumb slut."

7.

**Verdict**

{¶ 21} The jury found appellant guilty of felonious assault, and he was sentenced to a minimum of two years in prison and a potential maximum of three years in prison. Appellant appealed.

**First Assignment of Error**

{¶ 22} Appellant argues the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal, as he did not cause serious physical harm to the victim. Appellant maintains the state did not present credible evidence that he choked the victim, and the state was unable to offer proof that the victim wet herself while being choked, as the victim claimed. Appellant also observes the victim testified she had no follow-up doctor visits related to the incident. Appellant submits the victim's injuries were minimal and not serious in nature, as she had essentially two black eyes as the result of being slapped. Appellant asserts it strains credibility to think that no neighbor heard or reported the assault which took place over a four-hour period in the victim's apartment.

**Law**

{¶ 23} Crim.R. 29(A) provides:

> The court on motion of a defendant * * * after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses.

8.

{¶ 24} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 25} The felonious assault statute, R.C. 2903.11(A)(1) provides "No person shall knowingly * * * [c]ause serious physical harm to another." R.C. 2901.22(B) states "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶ 26} Under R.C. 2901.01(A)(5), "serious physical harm" means:

> * * *
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 27} When determining if the state proved the elements of serious physical harm, "Ohio appellate courts have held that '[w]here injuries are serious enough to cause him or her to seek medical treatment, the finder of fact may reasonably infer that the force exerted on the victim caused serious physical harm as defined by R.C. 2901.01(A)(5).'" (Citations omitted.) *State v. Lee*, 6th Dist. Lucas No. L-06-1384, 2008-Ohio-253, ¶ 30.

{¶ 28} In *State v. Pinkelton*, 6th Dist. Ottawa No. OT-07-047, 2009-Ohio-264, ¶ 11, 56, the victim was attacked in his asleep, and suffered "a black eye, fat lips, a busted up nose and a swollen ear," and his two front teeth were knocked out. The victim sought medical treatment on the day he was attacked, but he was not kept overnight in the hospital. *Id.* at ¶ 46. The victim admitted that on the day after he was injured, he could physically do his daily activities, but he had trouble speaking and could not eat. *Id.* No medical records were entered into evidence at trial concerning the victim's injuries. *Id.*

{¶ 29} We concluded the evidence, construed most favorably to the state, supported the findings that a reasonable trier of fact would find the victim suffered serious physical harm, as required to support a conviction for felonious assault, thus a reasonable trier of fact would find the victim suffered permanent physical disfigurement or temporary serious disfigurement, as defined in R.C. 2901.01(A)(5)(d). *Id.* at ¶ 56.

10.

**Analysis**

{¶ 30} Upon review, the evidence presented at trial shows the victim testified that for several hours, appellant slap her in the face, punched her in the ribs, kicked her in the stomach and back, and choked or strangled her. Appellant admitted he slapped the victim numerous time. The evidence further demonstrated the victim suffered injuries to her head, face, neck, ribs, arms and feet, she required medical attention and a hospital stay, and she suffered the effects of her injuries for over a month.

{¶ 31} Construing the evidence in a light most favorable to the state, as we are required to do, we find there was sufficient evidence which demonstrated the victim suffered serious physical harm. We further find that any rational trier of fact could have found the essential elements of felonious assault proven beyond a reasonable doubt. Consequently, the evidence was sufficient to support the conviction, and the trial court did not err in denying appellant's Crim.R. 29 motion for acquittal. Accordingly, appellant's first assignment of error is not well-taken.

**Second Assignment of Error**

{¶ 32} Appellant challenges the credibility of the evidence and argues the state did not present credible evidence that he caused the victim to suffer serious physical harm. Appellant asserts the jury completely discounted his testimony that although he forcefully slapped the victim five times, he did not choke or threaten her and he did not intend to hurt her.

11.

{¶ 33} Appellant further contends the jury's verdict discounted the fact that the victim apparently lied to him regarding the paternity of her baby. And, appellant submits, the jury did not give proper weight to the victim being less than truthful about wetting herself after allegedly being choked, and this issue directly challenges her truthfulness.

## Law

{¶ 34} Weight of the evidence concerns

the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. (Citation omitted.) *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 35} When analyzing a manifest weight of the evidence claim,

[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a

new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. (Citation omitted.) *Id.*

**Analysis**

{¶ 36} A review of the record shows there was credible evidence to support appellant's conviction for felonious assault, and we cannot find the evidence weighed heavily against the conviction, or that a manifest miscarriage of justice occurred. While appellant challenges the victim's credibility and the severity of her injuries, the resolution of inconsistent or conflicting evidence was left to the jury; we cannot say the jury lost its way. Accordingly, we find appellant's second assignment of error is not well-taken.

{¶ 37} The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Christine E. Mayle, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

13.