[Cite as *State v. Diebert*, 2014-Ohio-5588.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. WD-13-069

    Appellee                                 Trial Court No. 2013CR0191

v.

Frederick Diebert                                **DECISION AND JUDGMENT**

    Appellant                                Decided:  December 15, 2014

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, Thomas A.
Matuszak and David T. Harold, Assistant Prosecuting Attorneys,
for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**JENSEN, J.**

{¶ 1} Frederick V. Diebert appeals from a judgment of conviction and sentence

following a jury verdict finding him and his co-defendant, Michelle Scaggs, guilty of

workers' compensation fraud in violation of R.C. 2913.48(A)(5), a felony of the third

degree. For the reasons that follow, we reverse and vacate the judgment of the Wood County Court of Common Pleas, and vacate appellant's conviction.

{¶ 2} On April 18, 2013, the Wood County Grand Jury returned true-bill indictments against Mr. Diebert and Ms. Scaggs, charging each with one count of workers' compensation fraud in violation of R.C. 2913.48(A)(5), a felony of the third degree. The indictments alleged that "[o]n or about July 1, 2006 to February 28, 2009" Mr. Diebert and Ms. Scaggs did, "with purpose to defraud or knowing that [they] were facilitating a fraud, make * * * a false statement concerning * * * payroll * * * or number of personnel, when information of that nature was necessary to determine the actual workers' compensation premium" owed to the Bureau of Workers' Compensation ("BWC") and the value of the unpaid premiums was $150,000 or more.

{¶ 3} The case proceeded to trial by jury in July 2013. The state called three witnesses; the defense called none.

{¶ 4} The state's first witness was Craig Matthews, special agent in charge of the BWC's employer fraud team. Mr. Matthews testified that Fred Diebert dba Triple Star Roofing Company submitted an application to the BWC on August 25, 2000, for a workers' compensation policy. In the application, Mr. Diebert indicated he was in the business of residential construction and described his primary services as follows:

Tear off Roofing w/ shingle eaters (hand held) and Dispose in dumpster or haul to the dump. Install 3lb (always) felt paper w/staples.

2.

Install Asphalt (always) shingles w/ nails. Clean up. On occasion, Replace Sheeting.

On the application, Mr. Diebert indicated Triple Star Roofing would employ one to three laborers who would be responsible for tearing off roofs and one to three laborers who would be responsible for installing new roofs. The estimated eight-month payroll for the described laborers was $14,400. As a sole proprietor, Mr. Diebert elected not to cover himself. He claimed no office personnel on the application but listed Michelle Scaggs as the "business contact."

{¶ 5} The BWC assigned a policy number and forwarded a certificate of coverage to Triple Star Roofing. Following the initial application, Mr. Diebert and Ms. Scaggs submitted numerous semi-annual payroll reports indicating "zero" payroll. Because they reported no payroll expenses, Triple Star Roofing was required to pay no premiums.

{¶ 6} In 2007, the BWC received a complaint on its tip hotline against Triple Star Roofing. The complaint was referred to the BWC's premium audit department. The department attempted to schedule audits on two occasions, but both audits were cancelled by Triple Star's authorized business contact, Michelle Scaggs. Subsequent calls to Triple Star Roofing were not returned.

{¶ 7} On June 11, 2008, in response to a second complaint, Mr. Matthews traveled to a re-roofing jobsite in Millbury, Wood County, Ohio. Upon arrival, he noticed two Triple Star trucks in the driveway and an unmarked tool trailer. Mr. Matthews asked the jobsite supervisor for proof of workers' compensation coverage. The supervisor was not

able to provide the requisite documentation and suggested that Mr. Matthews speak with Ms. Scaggs. Shortly thereafter, Mr. Matthews called the BWC. During the call he was able to confirm that Triple Star Roofing did in fact have a workers' compensation policy. He was advised, however that Triple Star Roofing was reporting "zero payroll."

{¶ 8} Mr. Matthews made a visit to a second re-roofing jobsite in early 2009. He could not recall how many laborers were there. He did recall, however, speaking with a laborer who indicated he was "an employee" of Triple Star Roofing.

{¶ 9} Mr. Matthews testified that he spoke with only three laborers during his investigation of Triple Star Roofing. He had no opinion as to how many of those laborers would be classified as "employees" by the BWC. He stated, instead, that it was his responsibility to gather information and that it was the auditor's responsibility to determine "whether or not the person is picked up as an employee."

{¶ 10} After explaining the payroll reporting system to the jury, Mr. Matthews testified that Ms. Scaggs submitted a payroll report for the period of July 1 through December 31, 2006. The report indicated zero payroll. Ms. Scaggs submitted similar reports for the periods of January 1 through June 30, 2007; July 1 through December 31, 2007; and July 1 through December 31, 2008. Mr. Diebert submitted a zero payroll report on behalf of Triple Star for the period of January 1, 2008 through June 30, 2008. On March 5, 2009, Mr. Diebert submitted an amended payroll report for the period of July 1, 2008 through December 31, 2008. The amendment included $419.16 in payroll under a clerical classification.

4.

{¶ 11} On March 25, 2009, Special Agent Matthews met with Mr. Diebert, Ms. Scaggs, and the company's legal counsel. During the meeting, Mr. Matthews reviewed business records including bank statements and cancelled checks. Mr. Matthews explained:

> We broke down all the payroll records and there were several checks that were going out on a weekly or biweekly basis to the same people. We also noted that there were several checks going out for equipment, tool repairs, ladders, air hammers. There was [sic] purchases made for enclosed work trailers, things that would lead us to believe that they were operating a business with employees.

Mr. Matthews testified that in 2004—before the time included by the indictment—checks "were actually processed by paychecks and they said payroll checks all the way across the check." He indicated that several checks—including checks written during the time period included in the indictment—included the word "payroll" in the memo line. Special Agent Matthews explained:

> [S]everal of the checks did say payroll in the memo line. There was a few people that would say Payroll 006, Payroll 007, Payroll 008, like they were the employee identification number assigned to them. I believe 008 was assigned to Jason Foos. All of his checks said Payroll 008 until the date that I was out there on June 11th, 2008. After that point, it became Subcontractor 008 * * *.

5.

{¶ 12} Mr. Matthews testified that Mr. Diebert and Ms. Scaggs asserted that not all checks that indicated "payroll" in the memo-line were in fact payroll checks. Rather, the couple admitted they had engaged in a "check kiting" scheme to obtain cash to operate the business. Mr. Matthews explained,

> There were several checks that were cashed at Kroger. The checks indicated payroll on the memo line. The checks were usually in the amount of $700 or near that. We questioned [Scaggs and Diebert] about these checks as well. They indicated what they were doing is they were cashing checks --they were having workers go in and cash checks at Kroger. They had to say payroll on them because that was the only way Kroger would cash them, but there was a five-day turnaround by the time they received the cash from Kroger before the check would clear the Triple Star bank account. So they stated what they were doing is they were having people go in and cash checks to get money to operate their business because they knew they would have the money within five days to put back into their account to cover the checks once they cleared their bank.

{¶ 13} The state's second witness was Melody Hernandez. Ms. Hernandez testified that she "worked with the – worked for [Triple Star Roofing] maybe four days a week on average." While she could not remember the exact time period, she indicated it was sometime in "2006, 2007, 2008."

{¶ 14} Ms. Hernandez indicated that "they" would tell her what needed to be done and that she would "put together" a crew that consisted of her husband, her husband's brother, and a couple of cousins. While Ms. Hernandez never actually performed any work at a job site, it was her responsibility to "let the guys know where to go, collect the checks," and go out and check on her crew whenever they needed something.

{¶ 15} Ms. Hernandez indicated that she spent very little time at the jobsites. Yet, when she did go to a jobsite assigned to her crew, she usually saw at least one vehicle with Triple Star markings. Her crew did not travel in Triple Star vehicles. Rather, they drove to the job sites in their own vehicles. Generally, Ms. Hernandez's crew used their own tools, but if they did not have a tool they needed, Triple Star would "let [them] use it." Triple Star supplied the new roofing materials and provided dumpsters to dispose of the waste. A Triple Star sign would be placed in the yard of the home that was being re-roofed. At the completion of a job, Triple Star would pay Ms. Hernandez—generally by check but sometimes with cash—and then Ms. Hernandez would pay her crew.

{¶ 16} During cross-examination, Ms. Hernandez stated that toward the end of her relationship with Triple Star, her husband did not work exclusively for Triple Star but performed some work for another roofing company.

{¶ 17} The state's final witness was BWC auditor, Benjamin Croley. Mr. Croley explained that the Ohio Administrative Code requires businesses to keep certain records as part of "their deal" with BWC.

7.

{¶ 18} Mr. Croley testified that the BWC had attempted, on several occasions, to schedule audits in the second half of 2007, to no avail. These attempts continued until April 17, 2009, when Mr. Croley met with Ms. Scaggs and her attorney.

{¶ 19} Mr. Croley explained that he reviewed several Triple Star business records, including bank statements and cancelled checks. Thereafter, he prepared a list of roughly 90 individuals whose names were found in the company's "Quick Book" reports and/or were found on cancelled checks ("the 90 person list").[1] He then asked Michelle Scaggs to give him evidence "as to what these people were doing, how they were being paid, [and] what was being done." In response, Ms. Scaggs informed Mr. Croley that she had no records from 2004 and 2005 except for the previously disclosed records from Quick Books. She indicated that "records from part of 2008, all of 2007 & 2006 were turned into electronic files and most are not legible." She returned the 90 person list with several handwritten notations. These notations included one to five word descriptions such as "sub," "drywaller-painter," "loaned money," "sub painter," "siding sub," "sub – did one chimney repair," "primarily worked on our home," "poured concrete in our home," "my aunt," "nephew," "casual labor," "customer commission," "chimney fabricator, Tiny Tom," "did drywall work in our home," "niece purchased camper from," "father's brother" and "no record of him." Throughout the audit, Ms. Scaggs posited that most of the laborers were independent contractors or subcontractors and not employees.

---

[1] The list referenced throughout Mr. Croley's testimony as "the 90 person list" was attached to a letter marked state's exhibit 4-B. While Mr. Croley testified that the list contained 75-90 names, it actually included the names of 112 individuals.

8.

**{¶ 20}** Mr. Croley explained that in every audit, in order to determine whether a worker is an employee or an independent contractor, the BWC applies a 20 point test. At that time, the state produced exhibit 5-B entitled "Independent Contractor/Employee Questionnaire." "Triple Star Roofing & Home Improvement" was listed under the questionnaire's caption entitled "Name of person for whom determination is to be made." Mr. Croley noted that when he applied the test to Triple Star Roofing, he found 15 of the 20 criteria listed on the questionnaire.[2] Mr. Croley was then asked if he could share with the jury which 15 criteria were met and the following testimony was elicited:

> A. Okay. Number 1 the factor, "Is the person required to comply with instructions from the employer regarding the manner or method of performing services?" Yes, they are required to do the roof in the way that

---

[2] A review of the questionnaire, reveals Mr. Croley indicated "yes" to the following questions during the audit process: (1) Is the person required to comply with instructions from the employer regarding the manner or method of performing services? (3) Are the person's services integrated into the regular functioning of the employer? (4) Is the person required to perform the work personally? (5) Is the person hired, supervised, or paid by the employer? (6) Does a continuing relationship that contemplated continuing or recurring work exist between the person and the employer even if the work is not full time? (9) Is the person required to perform the work on the premises of the employer? (11) Is the person required to make oral or written progress reports to the employer? (12) Is the person paid on a regular basis such as hourly, weekly, or monthly? (13) Are the person's expenses paid by the employer? (14) Are the person's tools and materials furnished by the employer? (15) Is the person provided with facilities to perform the services? (16) Does the person NOT realize a profit or loss as a result of the services provided? (19) Does the employer have the right to discharge the person? (20) Does the person have the right to end the relationship with the employer without incurring liability pursuant to an employment contract or agreement?

9.

Triple Star prescribes, use the materials that they were purchased to use on that job.

* * *

Q. Okay. Based upon what information were you able to make that conclusion?

A. By the questions I was asking Michelle Scaggs and [her attorney] while I was performing the audit. I ran through this list with them at their garage or office above the garage.

* * *

Q. Okay. So all of this is based upon information that you got from Ms. Scaggs as representative of Mr. Diebert?

A. Yes.

Q. Factor number 2, "Are the person's services integrated into the regular functioning of the employer?

A. Yes.

* * *

Q. Ben, when you were doing this, are you considering all of the various individuals whose names were in the payroll records for Triple Star?

A. I went through the list that they provided based on that. But, then I did my due diligence beyond that fact of going back to the office and

verifying each individual person off that list to see whether or not A, they had a Workers' Comp policy or not. Some of the people did have Workers' Comp policies and they are noted on my work papers. If the people had a company name, I put that on the work papers as well.

Q. So what happened with somebody if they had a Workers' Comp policy, did you include them in your determination?

A. They were not included.

* * *

Q. All right. If the jury will bear [sic] with us. Number 4, "Is the person required to perform the work personally?"

A. Yes.

Q. And, again, you made these yes determination based upon the information provided by the defendants?

A. Correct.

{¶ 21} At that point in the testimony, the state deviated from the results of Mr. Croley's 20 point test and began questioning Mr. Croley as to his wage and premium calculations. The state presented exhibit 5-C captioned "Schedule of Audit Findings."

{¶ 22} Summarizing his audit findings, Mr. Croley indicated that Triple Star reported $464 in wages for the second half of 2006, but that he found $93,021 in wages for a difference of $92,557. He further indicated that he found $113,111 in wages for the first half of 2007; $113,111 in wages for the second half of 2007; $123,782 in wages for

11.

the first half of 2008 and $123,782 for the second half of 2008. Finally, Mr. Croley opined that unpaid premiums due to the BWC was $201,813.

{¶ 23} On cross-examination, Mr. Croley admitted he did not apply the 20 criterion listed in R.C. 4123.01(A)(1)(c) to all of the individuals on the 90 person list because he "was never provided the information from [Ms. Scaggs] to perform all of that test." Rather, "[i]t was done as an overall sum of how the business operated and was handled."

{¶ 24} Mr. Croley admitted that he did not question any laborers during his audit process. He only spoke with Ms. Scaggs, Mr. Diebert, and their attorney. Mr. Croley expressed, on several occasions, that Ms. Scaggs and Mr. Diebert failed to produce sufficient records. When asked what the lack of sufficient documentation meant to his investigation, Mr. Croley indicated the failure to produce the requisite information required him to use his best judgment to determine what amounts were due to the BWC. When asked about the integrity of the audit process and the certainty of his premium calculations, the following exchange occurred:

> Q. * * * [D]id you talk to Michelle Scaggs, my client?
>
> A. Yes.
>
> Q. Okay. And did she tell you that these were subcontractors?
>
> She made a comment that some of them are subcontractors, some were casual labor, some were personal payment to personal expenses for her and Fred.

12.

Q. Did you include those, too, in your audit?

A. Yes, I did.

Q. So someone that would do work on their own home, you included that in your audit?

A. Yes, I did.

Q. Or if they wrote a check to a family member as a loan, you put that in your own audit, didn't you?

A. Yes, I did.

\* \* \*

Q. Well, can you look at the documents in your box right there and tell me what money was business money and what money was personal money?

A. Again, if they would have provided me the records, I could have done that.

{¶ 25} Following the presentation of evidence, the jury found both Mr. Diebert and Ms. Scaggs guilty as charged. The trial court ordered a presentence report. At the sentencing hearing, the state presented evidence relating to the amount of restitution owed to BWC and the court took the matter under advisement. At the conclusion of the hearing, the trial court sentenced each defendant to 30 months of imprisonment in the Ohio Department of Rehabilitation and Corrections.

13.

{¶ 26} In his appeal, Mr. Diebert raises four assignments of error for our consideration:

I. The statute under which Appellant is charged, R.C. 2913.48, is void for vagueness under Article I, Sections 1 and 16 the Ohio Constitution and the Fourteenth Amendment of United States Constitution

II. The state committed prosecutorial misconduct during direct examination and closing argument.

III. The trial court erred in overruling Appellant's Rule 29 Motion for Acquittal.

IV. The jury's verdict was against the manifest weight of the evidence introduced at trial.

{¶ 27} We will address appellant's third assignment of error first.

{¶ 28} In his third assignment of error, appellant asserts that the trial court erred in overruling appellant's Civ.R. 29 motion for judgment of acquittal. Civ.R. 29(A) provides:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

14.

**{¶ 29}** Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In order to affirm the denial of a Crim.R. 29 motion, we need only find that there was legally sufficient evidence to sustain the guilty verdict. *Thompkins* at 386.

**{¶ 30}** With that standard in mind, we examine whether there is sufficient evidence to support the jury finding Mr. Diebert guilty of workers' compensation fraud.

**{¶ 31}** R.C. 2913.48 defines workers' compensation fraud and incorporates, by reference, workers' compensation coverage and benefits established in Chapters 4121., 4123., 4127., and 4131. of the Ohio Revised Code. R.C. 2913.48(A)(5) states that "[n]o person, with purpose to defraud or knowing that the person is facilitating a fraud shall * * * [m]ake or present or cause to be made or presented a false statement concerning * * * payroll, paid compensation, or number of personnel, when information of that nature is necessary to determine the actual workers' compensation premium or assessment owed to the bureau by an employer[.]" In turn, R.C. 2913.48(B) provides:

15.

Except as otherwise provided in this division, a violation of this section is a misdemeanor of the first degree. If the value of premiums and assessments unpaid pursuant to actions described in division (A)(5), (6), or (7) of this section, or of goods, services, property, or money stolen is one thousand dollars or more and is less than seven thousand five hundred dollars, a violation of this section is a felony of the fifth degree. If the value of premiums and assessments unpaid * * * is less than one hundred fifty thousand dollars, a violation of this section is a felony of the fourth degree. If the value of premiums and assessments unpaid * * * is one hundred fifty thousand dollars or more, a violation of this section is a felony of the third degree.

{¶ 32} The charges against Ms. Scaggs pertain to payroll reports submitted to the BWC during reporting periods covering July 31, 2006 through December 31, 2008. At trial, the state alleged that "zero payroll" was reported to the BWC when, in fact, $566,343 was paid to Triple Star employees. The state alleged that the premiums due to the BWC exceed $150,000.

{¶ 33} Under his third assignment of error, Mr. Diebert contends, in part, that the state did not present sufficient evidence to prove that the amount of premiums owed to BWC exceeds $150,000. In response, the state declares that its evidence is "overwhelming and unrebutted." Yet, it fails to pinpoint any evidence presented at trial that would support its premium calculation. Instead it makes only passing mention of the

16.

issue when it states "Diebert and Scaggs reaped the benefits: they undercut their competition in the roofing business for years; they procured customers; their workers obtained BWC coverage; and they saved $201,813 in unpaid BWC premiums."

{¶ 34} Given the state's perfunctory response to Mr. Diebert's third assignment of error, we are compelled to emphasize that one of the essential elements of felony workers' compensation fraud is the value of unpaid premiums and assessments. *See State v. Allen*, 29 Ohio St.3d 53, 55, 506 N.E.2d 199 (1987) (a factor that increased the degree of a crime is an essential element of the crime and must be proved by the state). Thus, the state must prove, beyond a reasonable doubt, the value of unpaid premiums and assessments due to the BWC.

{¶ 35} Upon our review of the record, we find that BWC auditor Ben Croley is the only witness who testified as to the amount of unpaid premiums. Mr. Croley explained that his role as BWC auditor was to "go out to businesses and review their records in the way of payroll through State Unemployment, Medicare, general journal entries, [and] any type of cash checking accounts." According to Croley, the purpose of an audit "is to make sure everyone is reporting properly to payroll and everyone is on the same legal playing field as everybody else."

{¶ 36} As a general proposition, "[t]he factual predicate for participation in the [insurance fund] is the existence of an employer-employee relationship." *Walters v. Americab*, 118 Ohio App.3d 180, 182, 692 N.E.2d 234 (8th Dist.1997). In other words, if an employer/employee relationship does not exist, the provisions of the workers'

17.

compensation law do not apply. "Whether someone is an employee or an independent contractor is ordinarily an issue to be determined by the trier of fact." *Bostic v. Conner*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881 (1988).

{¶ 37} R.C. 4123.01(B) defines "employer" for purposes of the workers' compensation system as:

> Every person, firm, and private corporation * * * that (a) has in service one or more employees regularly in the same business or in or about the same establishment under any contract of hire, express or implied, oral or written, or (b) is bound by any such contract of hire or by any other written contract, to pay into the insurance fund the premiums provided by the chapter.

{¶ 38} R.C. 4123.01 defines "employee" for purposes of the workers' compensation system as:

> Every person in the service of a person, firm, or private corporation * * * that (i) employs one or more persons regularly in the same business or in or about the same establishment under any contract of hire, express or implied, oral or written, including aliens and minors * * * and casual workers who earn one hundred sixty dollars or more in cash in any calendar quarter from a single employer, or (ii) is bound by any such contract of hire or by any other written contract, to pay into the state insurance fund the premiums provided by this chapter.

18.

In turn, R.C. 4123.01(A)(1)(c) sets forth 20 criteria to be used in determining whether a person who performs labor or provides services pursuant to a construction contract is an employee for purposes of the workers' compensation system. R.C. 4123.01(A)(1)(c) states:

> Every person who performs labor or provides services pursuant to a construction contract, as defined in section 4123.79 of the Revised Code, if at least ten of the following criteria apply:
>
> (i) The person is required to comply with instructions from the other contracting party regarding the manner or method of performing services;
>
> (ii) The person is required by the other contracting party to have particular training;
>
> (iii) The person's services are integrated into the regular functioning of the other contracting party;
>
> (iv) The person is required to perform the work personally;
>
> (v) The person is hired, supervised, or paid by the other contracting party;
>
> (vi) A continuing relationship exists between the person and the other contracting party that contemplates continuing or recurring work even if the work is not full time;
>
> (vii) The person's hours of work are established by the other contracting party;

(viii) The person is required to devote full time to the business of the other contracting party;

(ix) The person is required to perform the work on the premises of the other contracting party;

(x) The person is required to follow the order of work set by the other contracting party;

(xi) The person is required to make oral or written reports of progress to the other contracting party;

(xii) The person is paid for services on a regular basis such as hourly, weekly, or monthly;

(xiii) The person's expenses are paid for by the other contracting party;

(xiv) The person's tools and materials are furnished by the other contracting party;

(xv) The person is provided with the facilities used to perform services;

(xvi) The person does not realize a profit or suffer a loss as a result of the services provided;

(xvii) The person is not performing services for a number of employers at the same time;

(xviii) The person does not make the same services available to the general public;

(xix) The other contracting party has a right to discharge the person;

(xx) The person has the right to end the relationship with the other contracting party without incurring liability pursuant to an employment contract or agreement.

{¶ 39} In Ohio, every employer amenable to the workers' compensation law is required to keep detailed records "showing in detail all expenditures for payroll reportable to Ohio and the division of such expenditures in the various divisions and classifications of the employer's business." Ohio Adm.Code 4123-17-17(A). In turn, the BWC has the right to inspect such records and determine the amount of premiums due from the employer. Ohio Adm.Code 4123-17-17(B) and R.C. 4123.24. If an employer fails to keep the detailed records, BWC findings upon review of "such information as is available to it * * * shall constitute prima facie evidence of the amount of premium due from the employer." *Id.*

{¶ 40} Courts generally afford great deference to the BWC's expertise in premium matters. *State ex rel. Progressive Sweeping Contractors, Inc. v. Ohio Bur. of Workers' Comp.*, 68 Ohio St.3d 393, 396, 627 N.E.2d 550 (1994). However, in an action alleging felony workers' compensation fraud, the state must demonstrate every element beyond a reasonable doubt. Thus, BWC findings utilized for adjustment of payroll reports under

Ohio Adm.Code 4123-17-17 and R.C. 4123.24 are not automatically sufficient to prove felony workers' compensation fraud to the requisite level of proof.

{¶ 41} It has been argued that a rational trier of fact could have found Mr. Croley's determination that an employer-employee relationship existed was "believable" because it was based on information provided to Mr. Croley by Ms. Scaggs during the audit process. However, Mr. Croley's *believability* is not a consideration in our determination of the *sufficiency* of the evidence as it relates to the elements necessary to prove the existence of an employer-employee relationship. "[S]ufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "A conviction based on legally insufficient evidence constitutes a denial of due process." *State v. Ferguson*, 6th Dist. No. F-00-018, 2001 WL 256131, *2 (Mar. 16, 2001), citing *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). *See generally State v. Kareski*, 137 Ohio St.3d 92, 2013-Ohio-4008, 998 N.E.2d 410.

{¶ 42} Here, Mr. Croley admitted that he did not apply the 20 point test to all individuals on the 90 person list because he "was never provided the information from [Ms. Scaggs] to perform all of that test." Mr. Croley indicated, instead, that the test was applied "as an overall sum of how the business operated and was handled." Even assuming that it was acceptable to group all of the individuals on the 90 person list into one "class of people" absent evidence of identical or even similar working relationships,

22.

we find that Mr. Croley's conclusory opinion that 15 of the 20 criteria listed in R.C. 4123.01(A)(1)(c) existed was gravely insufficient. During trial, Mr. Croley was only questioned as to the existence of 3 of the 15 criteria before the prosecutor diverted the line of questioning to Mr. Croley's unpaid premium calculations. This court has previously held that "[a]ssumptions upon which the expert bases his or her opinions must be supported by evidence in the factual record." *Wallace v. Kalniz, Choksy Dental-Ralston, Inc.*, 6th Dist. Wood No. WD-12-048, 2013-Ohio-2944, ¶ 36, citing *Rose v. Truck Centers, Inc.*, 611 F.Supp.2d 745, 750 (N.D.Ohio 2009). While this point of law typically triggers a credibility argument, in this case, the lack of evidence in the factual record supporting Mr. Croley's conclusory opinion only underscores the state's failure to introduce sufficient evidence in support of the statutory criteria necessary for the fact-finder to conclude, on its own accord, the existence of an employer-employee relationship.

{¶ 43} In other words, the jury was never given an opportunity to hear evidence relating to all of the 15 criteria Mr. Croley claimed existed. Evidence, including conclusory "expert" testimony from a BWC auditor about the existence of an employer-employee relationship based upon assumptions not supported by the factual record is insufficient to prove beyond a reasonable doubt that at least 10 of the criteria specified under R.C. 4123.01(A)(1)(c) were met. Thus, the state failed to present sufficient evidence to support the predicate finding of an employer-employee relationship.

23.

{¶ 44} As to the amount of unpaid premiums due to the BWC, Mr. Croley testified that he specifically *excluded* from his premium calculation all payments made to individuals or companies that had a valid workers' compensation policy. However, he *included* in his premium calculation monies paid to individuals who did not have a worker's compensation policy in the BWC system. He made this determination despite knowing he had insufficient data to separately classify each individual as an employee under the 20 point test.

{¶ 45} Mr. Croley testified that he *included* in his premium calculation monies paid to individuals to whom Michelle Scaggs had listed as monies paid for services performed or labor provided on the home she shared with Mr. Diebert, monies she loaned to family members, monies she paid to her sister for a camper, and monies she paid to individuals she specifically identified as independent contractors.

{¶ 46} Finally, despite the couple's admission to a check kiting scheme, Mr. Croley testified that he *included* in his premium calculation all checks cashed at Kroger with "payroll" in the memo line.

{¶ 47} As stated above, in order to prove felony workers' compensation fraud, the state must prove, beyond a reasonable doubt, the amount of unpaid premiums due to the BWC from the employer. An employer's obligation to pay premiums into the state insurance fund is triggered solely by the existence of an employer-employee relationship. In order to demonstrate that an employer-employee relationship exists when labor is performed pursuant to a construction contract, the state must prove that 10 of the 20

24.

criteria listed in R.C. 4123.01(A)(1)(c) exist. Then, once an employer-employee relationship is found, the state must show that monies included in the premium calculation *only* took into account monies paid to employees for wages and not, as in this case, for undocumented or unexplained expenses or check kiting.

{¶ 48} Mr. Croley's conclusory opinion as to the amount due to the BWC for unpaid premiums was not based upon facts in evidence, but upon (a) his unsupported assumption that all unexplained checks written to individuals, including Ms. Scaggs, were compensation for labor performed or services provided Triple Star Roofing; and (b) upon his unsupported assumption that all individuals on the 90 person list had identical working relationships with Triple Star Roofing and thus similarly qualified as employees under R.C. 4123.01(A)(1)(c). Other than Mr. Croley's opinion and work product, there was no other evidence admitted in support of the value of the unpaid premiums. Thus, reviewing the evidence in a light most favorable to the prosecution, we find that the evidence presented by the state was not sufficient to convince a rational trier of fact of the value of unpaid premiums, an essential element of workers' compensation fraud. Accordingly, Mr. Diebert's third assignment of error is well-taken.

{¶ 49} App.R. 12(A)(1)(c) requires this court to decide each assignment of error and give reasons in writing, unless an assignment of error is rendered moot by a ruling on another assignment of error. Based upon our disposition of the third assignment of error, we find all remaining assignments of error are rendered moot.

25.

**{¶ 50}** For the foregoing reasons, the judgment of the Wood County Court of Common Pleas is reversed and vacated and appellant's conviction is vacated. The state is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____
                                             JUDGE

James D. Jensen, J.
CONCUR.                         _____
                                             JUDGE

Stephen A. Yarbrough, P.J.,
DISSENTS.

**YARBROUGH, P.J.**

**{¶ 51}** Because I find that sufficient evidence exists to support Frederick Diebert's conviction, I respectfully dissent.

**{¶ 52}** Mr. Diebert was convicted for defrauding Ohio's Bureau of Workers' Compensation in violation of R.C. 2913.48(A)(5) and (B), a felony of the third degree. One element of that crime is that "the value of premiums and assessments unpaid * * * is one hundred fifty thousand dollars or more." To satisfy this element, the state introduced

26.

the testimony of the BWC auditor, Benjamin Croley, who testified that the value of the unpaid premiums is $201,813. No other evidence was presented attempting to establish a different amount. Based on this, when viewing the evidence in a light most favorable to the prosecution, I disagree with the majority that a rational trier of fact could not conclude beyond a reasonable doubt that the value of the unpaid premiums is greater than $150,000.

{¶ 53} Mr. Diebert's argument, and the majority's reasoning, focuses not on the existence of testimony supporting a value greater than $150,000, but rather its credibility. In effect, Mr. Diebert contends that Mr. Croley's statement as to the value of the unpaid premiums is so unreliable that it should not be considered. He bases his argument on the fact that Mr. Croley did not individually apply the 20-point test to each worker on the 90-person list to determine if he or she was an employee or an independent contractor.

{¶ 54} Notably, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). The trier of fact may believe all, some, or none of what a witness says. *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 55} Here, the state presented evidence and testimony to the jury that on April 17, 2009, Mr. Croley appeared at Triple Star Roofing's business location, where he met with Michelle Scaggs and her attorney. Mr. Croley testified that, at that time, he reviewed Triple Star's records, including its 1099 forms, unemployment forms, W2 forms, and its general ledger maintained in QuickBooks. Mr. Croley testified that he also

27.

went through the 20-point test with Ms. Scaggs. Based on her responses regarding the operation of the company, Mr. Croley determined that 15 of the 20 criteria had been met, thus indicating that Triple Star's workers were employees. Mr. Croley admitted on cross-examination, however, that he did not apply the test to any of the workers individually. The jury, upon hearing all of his testimony, chose to believe Mr. Croley's determination that the workers were employees.

{¶ 56} I conclude that a rational trier of fact could find that Mr. Croley's determination was believable because it was based on information provided by Triple Star's representative, who undoubtedly would be in a position to describe the nature of Triple Star's relationship with its workers. Although Mr. Croley could have unearthed additional information by interviewing each of the workers, his failure to do so does not render his determination unreliable. Further, the fact that he did not apply the test at an individual level does not invalidate his result because, in effect, he applied the test to the class of people who worked for Triple Star based on the overall operation of the business and its treatment and handling of that group. Mr. Croley's conclusion as to who belonged to that class—i.e., Ms. Scaggs and those individuals listed as "subs" or "casual labor"— is supported by his interview with Ms. Scaggs, his review of the business records, and Ms. Scaggs' notations on the 90-person list. Moreover, Mr. Croley then went through that group and excluded any person who had their own workers' compensation policy, thereby giving the benefit of the doubt to Triple Star that such a

28.

person was an independent contractor and not an employee. Therefore, Mr. Croley's determination as to who were employees of Triple Star is not incredible.

{¶ 57} In determining the value of the unpaid premiums, Mr. Croley utilized the 90-person list, along with the banking and QuickBooks records and the information provided by Ms. Scaggs, to calculate the amount of money that was paid to each employee in a calendar year, the results of which were entered into evidence without objection. For example, in 2007, Triple Star paid $53,725 to Ms. Scaggs,[3] $148,382 to workers listed on the 90-person list as "sub" or "casual labor,"[4] $16,220 to people listed as doing work on the defendants' home, $5,495 to people listed as friends and family, and $2,400 to people with miscellaneous other descriptions.[5] Ultimately, Mr. Croley testified to the total amount that was captured as payroll by the BWC, and based on those numbers, he calculated that the amount due in unpaid premiums was $201,813.

{¶ 58} A rational trier of fact, when viewing this testimony in a light most favorable to the prosecution, could find beyond a reasonable doubt that the people employed by Triple Star to do work were indeed employees for purposes of workers'

---

[3] Checks were either payable to Ms. Scaggs, or payable to "cash" and endorsed by Ms. Scaggs.

[4] Of that amount, $125,435 was paid to two workers: Larry Dukeshire and Luis Hernandez.

[5] The payments for the remaining portion of the indictment period include: Ms. Scaggs - $21,600 (2006-half), $18,973 (2008); workers listed as "sub" or "casual labor" - $64,301 (2006-half), $206,003 (2008); people doing work on the defendants' home - $163 (2006-half), $16,150 (2008); friends and family - $1,860 (2006-half); $1,625 (2008); and miscellaneous - $4,633 (2006-half), $4,812 (2008).

29.

compensation, that they were paid a specific amount that went unreported, and that the amount of unpaid premium on that unreported payroll is greater than $150,000.

{¶ 59} The majority relies in part on Mr. Croley's inclusion of the payments to friends and family or for work done on the defendants' home, and his inclusion of payroll checks that were cashed as part of a check-kiting scheme, as support for its conclusion that he took into account more than just the money paid to employees for wages. As to the former, Mr. Croley testified that those amounts should be included because they were payments out of the business account for personal expenses and would be considered as payment "in-kind" to Ms. Scaggs. Nevertheless, even if those amounts are excluded, the payments to Ms. Scaggs—either directly or through checks made out to "cash" and endorsed by her—and the payments to the people listed as "subs" or "casual labor" comprise 90 percent of the total payroll captured in the audit. Thus, the unpaid workers' compensation premium on such an amount still exceeds the $150,000 threshold for a third degree felony. As to the latter, I find it reasonable that Mr. Croley did not apply an exception to the BWC payroll reporting requirements for payroll checks that were cashed by employees just because those checks were cashed as part of an illegal check-kiting scheme.

{¶ 60} Accordingly, I would hold that Mr. Croley's testimony was sufficient to enable a rational trier of fact to find the essential element of the value of the unpaid premiums proven beyond a reasonable doubt, and therefore would find Mr. Diebert's

30.

third assignment of error not-well taken.  Furthermore, finding no merit to Mr. Diebert's other assignments of error, I would affirm the judgment of the Wood County Court of Common Pleas.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.