[Cite as *State v. Sprankle*, 2022-Ohio-3812.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| AMANDA M. SPRANKLE, | : | Case No. CT2022-003 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:                Appeal from the Muskingum County
                                        Court of Common Pleas, Case No.
                                        CR2021-0036


JUDGMENT:                               Affirmed


DATE OF JUDGMENT:                       October 25, 2022


APPEARANCES:

For Plaintiff-Appellee                  For Defendant-Appellant

RONALD L. WELCH                         JAMES S. SWEENEY
Prosecuting Attorney                    James A. Sweeney Law, LLC
Muskingum County, Ohio                  285 South Liberty Street
                                        Powell, Ohio 43065
By: TAYLOR P. BENNINGTON
Assistant Prosecuting Attorney
Muskingum County, Ohio
27 North Fifth Street., P.O. Box 189
Zanesville, Ohio 43702-0189

*Baldwin, J.*

{¶1} Defendant-appellant Amanda Sprankle appeals her rape conviction from the Muskingum County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2} On January 20, 2021, the Muskingum County Grand Jury indicted appellant on one count of rape in violation of R.C. 2907.02(A)(1)(a), a felony of the first degree, and one count of rape in violation of R.C. 2907.02(A)(1)(c), also a felony of the first degree. At her arraignment on January 27, 2021, appellant entered a plea of not guilty to the charges.

{¶3} Subsequently, a jury trial commenced on October 12, 2021. At the beginning of trial, the trial court dismissed the first count of the indictment and the case proceeded on the count alleging a violation of R.C. 2907.02(A)(1)(c). The following testimony was adduced at trial:

{¶4} At trial, S.H. testified that she was 16 years old and that H.H. was her brother. She testified that H.H. was 17 years old. S.H. also testified that appellant was her half-sister and that before September of 2020, she used to spend the night at appellant's house.

{¶5} S.H. testified that on September 25, 2020, her parents dropped her and H.H. at appellant's house. She testified that, in addition, appellant's son, L.H., and appellant's mother were also present. Appellant's husband later arrived from work. S.H. testified that as the party went on that day, everyone was consuming alcohol. She testified that she observed appellant and H.H. consume alcoholic drinks, which she thought were something mixed with Pepsi. S.H. testified that appellant was drunk when

S.H. arrived and that she gets "touchier when she's drunk." Trial Transcript, Volume II at 185. S.H. testified that later that night, appellant's husband and mother had gone to sleep while L.H. was in his room. While she was in the living room, appellant and H.H. were outside on a swing.

{¶6}    S.H. testified that she eventually went outside and did not see appellant or H.H., but saw H.H.'s boots and hat outside.  She testified that she then went inside and got L.H. and appellant's mother and that she and L.H. went outside and began yelling for H.H. and appellant. She testified that she and L.H. found them near the garage and that appellant was laying on the ground and she was "pretty sure she didn't have a shirt on." Trial Transcript, Volume II at 189. H.H. was fully clothed.  S.H. testified that when L.H. asked appellant why she had her shirt off and what she was doing, appellant stated that H.H. was helping her fix her bra strap.  She testified that appellant was still trying to fix her bra strap while H.H. did not say anything.

{¶7}    According to S.H., after everyone went back inside, H.H. went to use the bathroom. After a while, S.H. went to check on him and found him passed out on the ground. S.H. helped H.H. get up and go into L.H.'s room, where he passed out on the bed. On cross-examination, S.H. admitted that she told a detective that she did not know what happened between appellant and H.H and that she never asked H.H. or appellant about what had happened. She testified that appellant's pants and bra were on when she first saw appellant and that appellant's shirt was hanging off. On redirect, she testified that she did not see appellant crying and that appellant did not have any grass or dirt marks or injuries on her face.

**{¶8}** H.H. testified that he was 17 years old and would have been 16 years old in September of 2020. He testified that appellant was his sister and that he would go to appellant's house to see L.H. H.H. testified that he arrived at appellant's house on September 25, 2020 at around 6:30 or 7:00 p.m. and that his sister S.H. came with him. He testified that he voluntarily consumed three drinks that were vanilla rum and Dr. Pepper and that he got the drinks from appellant and that appellant consumed the same drinks. H.H. testified that later that evening, it was just him and appellant on the front porch. He testified that appellant grabbed his right upper thigh and "[j]ust left it there." Trial Transcript, Volume II at 260. After this occurred, H.H. went down the porch stairs and walked to the side of the house. He testified that at the time, he was able to stand and walk okay. H.H. testified that once he got around to the side of the house, appellant was standing in front of him. When asked what he remembered happening next, H.H. testified that he recalled S.H. screaming and her, L.H. and appellant's mother standing on the other side of the garage. He testified that after he heard her scream, he hurried and ran to the front of the house.

**{¶9}** When H.H. was asked if there was anyone around or near him as he heard this shouting, he testified that appellant was on top of him. Once he realized appellant was on top of him, he jumped up, pulled up his underpants and pants and went to the front of the house. Appellant was on the ground at the time. H.H. testified that appellant was on top of him when he heard the screaming. He testified that he saw his sister S.H., L.H. and appellant's mother. H.H. testified that L.H. said something to him and that he responded "no, I didn't." Trial Transcript, Volume II at 270. H.H. did not say anything to his sister S.H. or appellant's mother and went back into the house and did not tell anyone

what had happened with appellant because he was "scared." Trial Transcript at, Volume II at 272.

{¶10} H.H. testified that he later spoke with a police officer or detective and was then asked to go to Children's Hospital.   He testified that when he was on the ground, appellant got off the top of him. He testified that her shirt and pants were off and that he did not know how they got off or how his pants got off or his boots ended up on the driveway or side of the house.  He testified that his penis was exposed and that his penis came into contact with appellant's vagina. H.H. testified he felt "wet" when asked to describe the sensation that he felt on his penis. Trial Transcript, Volume II at 276.

{¶11} H.H., when asked why he did not stop appellant from doing what she was doing when she was on top of him, testified that he did not realize what she was doing. He testified that he felt the wetness on his penis and felt his penis in between appellant's private area when appellant got off of him. The following is an excerpt from H.H.'s testimony at trial:

{¶12} Q.  Okay.  You said you felt her wetness on your penis?

{¶13} A.  Yes, when she got off.

{¶14} Q.  Could you feel your penis in between her private area?

{¶15} A.  Not until she got off, no.

{¶16} Q.  Could you feel - - you had not had not have intercourse before this night - -

{¶17} A.  No, sir.

{¶18} Q.  – is that accurate?

And what about this incident that you could tell that your penis was - - had penetrated any part of her private area where you felt the wetness?

**{¶19}** A.  Because it was hard.

**{¶20}** Q.  What was hard?

**{¶21}** A.  My penis.

**{¶22}** Q.  Okay.  And do you know how it got to be hard or erect?

**{¶23}** A.  No, sir.

**{¶24}** Q.  And could you feel it - - wetness around your penis?

**{¶25}** A.  Yes, sir.

**{¶26}** Q.  Could you feel your penis inside of her?

**{¶27}** A.  No, sir.

**{¶28}** Q.  Do you feel you feel your penis on the out - - outside of what her vagina would be?

**{¶29}** A.  No, sir.

**{¶30}** Trial Transcript, Volume II at 282-283.

**{¶31}** He testified that appellant's full body weight was on top of him. H.H. further testified that he felt wetness on his penis when he pulled his underwear up and that the wetness was too much to have come from him. The wetness was not there until appellant got up.

**{¶32}** H.H. also testified that in addition to the drinks that appellant gave him, he had two or three little pints of fireball. He testified that he threw up in the bathroom and that he did not want to engage in sexual conduct with his sister, appellant.

{¶33} On cross-examination, H.H. admitted to being suspended from school for fighting and vaping. He also admitted to shooting L.H., who is his cousin, once with a BB gun, although he claimed that it was an accident. He also admitted that he had swung at his father when he attempted to discipline H.H. and that he had had alcohol in the past and had been drinking for a while. He testified that he never had as much to drink as he did on September 25, 2020 and had never been drunk before. H.H. testified that appellant gave him alcohol on such date and that she paid for the alcohol.

{¶34} H.H. testified that he was very intoxicated when appellant came onto him and that he was "really dizzy" and felt like he was going to throw up. Trial Transcript, Volume II at 303. He testified that he was having difficulty walking and nearly fell down the stairs. H.H. testified that appellant rubbed his right thigh while he was sitting on the swing next to her. He testified that he did not touch appellant and was not sure if she touched him while he was leaning against the house. He also testified that he was unsure if appellant exposed his penis, or if he did but was "pretty sure" that she did. Trial Transcript, Volume II at 312. He testified that appellant was wearing a white t-shirt and pink pajamas and that while her bottoms and underwear were off later, he did not know who took appellant's clothes off. He testified that he did not take off his own clothing.

{¶35} During cross-examination. H.H. admitted telling Detective Randy Wilson that the encounter between him and appellant was consensual, but testified that he did not understand what consensual meant. He testified that he never told appellant to stop or tried to push her away. He also admitted that he could have overpowered appellant during the encounter but did not. According to H.H., he was able to get his clothes back on quickly after the incident and run back over to the front of the house. He testified that

he denied raping appellant to L.H., but admitted that he did not tell L.H. or S.H. that he had been the one who had been raped. He testified that he did not want appellant's husband to know because he was scared of him.

{¶36} H.H. testified that several weeks after the incident, he told appellant's husband and his father that he did not do anything wrong and had was just adjusting appellant's bra strap. He admitted that this was a lie and testified that he lied because he was scared. H.H. was later interviewed by Detective Wilson in October of 2020. He testified that he told the Detective that he had had sex with appellant and that it was her idea. He admitted saying that the sex was consensual, but testified that he thought that it was consensual because he did not do anything to stop it. He testified that he never told his mother that he had been raped by appellant but that the Detective told her.

{¶37} In December of 2020, H.H. was interviewed at Nationwide Children's Hospital. H.H. admitted that he indicated that appellant had done something to him while every time before he had not included such fact. He testified that he had not told anyone except the medical people at the hospital that he was raped. He testified that he told them that appellant kept giving him alcohol to where he could not walk. He testified that, during the sexual encounter, both he and appellant were naked on the bottom. He admitted describing appellant's body as going up and down to the hospital workers. He testified that appellant had one of her hands on his shoulder and the other on the wall. H.H. testified that when he was later hanging out in L.H.'s room and appellant came into the room a couple of times, he did not tell anyone that she had just raped him. H.H. testified that he was being honest at Nationwide Children's Hospital and that it was the first time

that he was telling the truth. He testified that most of what he had said previously was not the truth. He denied that he was the one who had assaulted appellant.

**{¶38}** On redirect. H.H. testified that he did not tell his mother about the incident with appellant because he was scared. He later told his father who was also appellant's father. H.H. testified that his father indicated that he already knew what had happened. H.H. testified that the first chance he had to explain what had happened in detail was with medical personnel at the hospital.

**{¶39}** The next witness to testify was Officer Logan Wisecarver who at the time in question was a Deputy with the Muskingum County Sheriff's Office. He testified that he was dispatched to appellant's residence on October 7, 2020 in reference to a sexual assault. Officer Wisecarver testified that he interviewed appellant, who had wanted to make a report, and she told him that, on the night in question, she had been drinking and went around back behind her garage to use the bathroom. She told him that she pulled her pants and underwear down to her knees and squatted to urinate and that H.H. then came around the garage, tackled her and inserted himself inside of her. She told him that H.H.'s pants were already pulled down when he came around the corner and his penis was exposed. Appellant told the Officer that she was intoxicated at the time. According to the Officer, both appellant and her husband were pretty distraught at the time of the interview. The Officer listed appellant as the victim of a rape offense and H.H. as the suspect. He testified that his police report listed appellant as five-foot one and 175 pounds and H.H. as being five-feet nine and 167 pounds. Appellant also quoted H.H. as saying "Sissy, your pussy feels so good." Trial Transcript, Volume III at 412.

**{¶40}** Celeste Prince, a forensic interviewer at Nationwide Children's Hospital, testified that she interviewed H.H. on December 16, 2020. The jury had the benefit of watching the forensic interview. During the interview, appellant said that appellant helped him walk to around the back of the house by the garage, took H.H.'s pant and underwear off and her own clothing off, and "then got on top of [H.H.] and put [his] dick, penis inside her vagina." Trial Transcript, Volume III at 593. Prince testified that H.H. said that appellant was telling him how much she loved him and how good it felt and that appellant's body was "going up and down" while appellant was on top of him. Trial Transcript, Volume III at 593. Appellant had one hand on the wall and the other on his shoulder. During the interview, H.H. reported that appellant got off of him quickly and that he put on his clothes and shoes and went to the porch.

**{¶41}** Appellant's husband, M.S., testified at trial that between September 26, 2020 and October 7, 2020 when a police report was made, appellant was not acting herself and he could tell that something was bothering her. He testified that he was told on October 7, 2020 by R.H., L.H.'s biological father's aunt that H.H. had forced himself on appellant. According to him, appellant told R.H. to tell him because she was afraid to tell him because she was afraid that M.H. might harm H.H. as a result. He testified that they decided to make a report to the police department and that Officer Wisecarver came to the house. M.S. testified that H.H. told him that he was just adjusting appellant's bra. He testified that appellant's father implied that if they continued pursuing the case against appellant, "they would try to turn the tables." Trial Transcript at, Volume IV at 700. M.S. testified that appellant was arrested on October 31, 2020 after appellant struck him. Appellant was arrested for domestic violence, but it was later reduced to disorderly

conduct. Appellant was arrested on the charges in this case on January 21, 2021. M.S. testified that after September 25, 2020, appellant sometimes cried for no reason and sat on the couch "rocking back and forth staring." Trial Transcript, Volume IV at 720. He testified that she tried to commit suicide.

**{¶42}** L.H., appellant's son, testified that he was thirteen at the time of the trial. He testified that H.H. was his uncle. He testified that appellant was intoxicated on the night in question and "was like kind of not walking straight. She was talking slow." Trial Transcript, Volume IV at 750. He testified that H.H. was drinking fireball shots, vanilla rum and Pepsi and beer. L.H. also testified that he and S.H. went looking for H.H. and appellant. He testified that he saw them when he rounded the garage corner and that appellant hurried up and leaned up against the garage when L.H. rounded the corner. When he asked H.H. what they were going, H.H. said that he was fixing appellant's bra. L.H. testified that he was suspicious because he could see appellant crying when he rounded the corner and she was laying down with her shirt off around her arm. L.H. testified that after the incident, H.H. came into his room and started getting aggressive and arguing with him about what had happened. L.H. testified that he felt threatened.

**{¶43}** At the conclusion of the trial and the end of deliberations, the jury found appellant guilty of the one count of rape. Pursuant to an Entry filed on December 9, 2021, appellant was ordered to serve a ten year mandatory minimum sentence, with an indefinite prison term of up to fifteen years.

**{¶44}** Appellant now appeals, raising the following assignments of error on appeal:

**{¶45}** "I. THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT THE DEFENANT'S (SIC) MOTION FOR ACQUITTAL AS THE GUILTY VERDICT AT THE TRIAL COURT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

**{¶46}** "II. THE TRIAL COURT ERRED WHEN IT ENTERED A JUDGMENT AGAINST APPELLANT WHEN THE JUDGMENT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶47}** "III. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO DECLARE A MISTRIAL OR ISSUE A CURATIVE INSTRUCTION SUA SPONTE AFTER THE PROSECUTOR ELICITED TESTIMONY REGARDING APPELLANT'S PRE-ARREST SILENCE."

**{¶48}** "IV. APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL TO A DEGREE THAT SHE DID NOT RECEIVE A FAIR TRIAL."

I, II

**{¶49}** Appellant, in her first assignment of error, argues that the trial failed to grant appellant's Motion for Judgment of Acquittal as the verdict was not supported by sufficient evidence. In her second assignment of error, she argues that her conviction for rape is against the manifest weight of the evidence.

**{¶50}** A Crim. R. 29(A) motion for acquittal tests the sufficiency of the evidence presented at trial. *State v. Blue*, 5th Dist. Stark No. 2001CA00250, 2002-Ohio-351, 2002 WL 121851, *citing State v. Williams*, 74 Ohio St.3d 569, 576, 1996-Ohio-91, 660 N.E.2d 724; State v. Miley, 114 Ohio App.3d 738, 742, 684 N.E.2d 102 (4th Dist. 1996). Crim. R. 29(A) allows a trial court to enter a judgment of acquittal when the state's evidence is insufficient to sustain a conviction. A trial court should not sustain a Crim. R. 29 motion

for acquittal unless, after viewing the evidence in a light most favorable to the state, the court finds no rational finder of fact could find the essential elements of the charge proven beyond a reasonable doubt. *State v. Franklin*, 5th Dist. Stark No. 2007-CA-00022, 2007-Ohio-4649 at ¶ 12, citing State v. Dennis, 79 Ohio St.3d 421, 1997-Ohio-372, 683 N.E.2d 1096.

**{¶51}** Appellant, in the case sub judice, was convicted of rape in violation of R.C. 2907.02(A)(1)(c). Such section states, in relevant part, as follows:

**{¶52}** (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies: …

**{¶53}** (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

**{¶54}** R.C. 2907.01(A) defines sexual conduct to include in pertinent part: "the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

**{¶55}** Appellant argues that there was insufficient evidence of penetration. She notes that H.H. acknowledged that he never felt his penis inside of appellant and that his belief that his penis had penetrated her was based on his feeling of wetness after pulling his pants and underwear up, and  the fact that he had an erection.

**{¶56}** However, at trial, H.H. testified that appellant was on top of him and that both of their pants were off. He testified that his penis came into contact with appellant's vagina and that he could feel the sensation of wetness.   During his forensic interview at Nationwide Children's Hospital, H.H. disclosed that appellant had got on top of him and put his "dick, penis, in her vagina." Trial Transcript, Volume III at 593. H.H. also reported appellant's "body going up and down with one hand on the wall and one on his shoulder." Trial Transcript, Volume III at 593-594. The jury had the benefit of watching H.H.'s forensic interview.   Finally, appellant herself admitted that she had sexual intercourse with H.H. when she called the police alleging that she was the victim.

**{¶57}** We find, based on the foregoing, that there was sufficient evidence of penetration.

**{¶58}** Appellant also argues that there was insufficient evidence to establish that H.H.'s ability to resist or consent was substantially impaired. She noted that H.H. testified that he could have overpowered appellant but chose not to and that he testified that he was able to quickly get his clothes back on and run back over to the front of the house.

**{¶59}** However, H.H testified that appellant gave him vanilla rum and Dr. Pepper the day in question and that he had three drinks in total. He testified that, after the incident, he was feeling terrible and threw up a couple of times. He also testified that he had two or three fireballs in addition to the drinks that appellant made for him. H.H. testified that he was drunk on September 25, 2020 and had never been drunk before.  The following is an excerpt from H.H.'s testimony:

**{¶60}** Q.  Okay.  And let's turn to the night.  How long were you drinking for while you were at Amanda's that night?

**{¶61}** A. Maybe three or four hours. I'm not really for sure.

**{¶62}** Q. And before this incident occurred, where you claimed Amanda came on to you, how many drinks did you consume at that point?

**{¶63}** A. Three, and plus some fireball shots.

**{¶64}** Q. Okay. How many fireball shots.

**{¶65}** A. Two or three.

**{¶66}** Q. How intoxicated were you?

**{¶67}** A. Very.

**{¶68}** Q. Very. Okay. What were you feeling?

**{¶69}** A. My head was really dizzy. At some points I felt like I was going to throw up.

**{¶70}** Q. Okay. But that's not everything you drank that night, is it?

**{¶71}** A. No, sir.

**{¶72}** Q. You kept drinking after that; right?

**{¶73}** A. Not up to the incident happened, no.

**{¶74}** Q. Okay. But after you felt that way you kept drinking; right?

**{¶75}** A. Yes, sir.

**{¶76}** Q. Okay, So - -

**{¶77}** A. I started slowing down, though, because I knew I drank way too much.

**{¶78}** Q. You slowed down, which meant you kept drinking?

**{¶79}** A. Yes, sir.

**{¶80}** Q. Of your own volition?

**{¶81}** A. Yes, sir.

**{¶82}** Q. You felt dizzy?

**{¶83}** A. Yes, sir.

**{¶84}** Q. You felt like you were going to throw up. And you kept drinking anyways?

**{¶85}** A. Yes, sir.

**{¶86}** Q. But then after the incident you claimed you stopped; right?

**{¶87}** A. Yes, sir.

**{¶88}** Q. So that impairment that you claim you felt, you caused that; right? You drank the alcohol?

**{¶89}** A. Yes, sir.

**{¶90}** Q. Nobody did that to you; right?

**{¶91}** A. No, sir.

**{¶92}** Q. Nobody tricked you?

**{¶93}** A. No, sir.

**{¶94}** Q. Deceived you? Forced you? Threatened you?

**{¶95}** A. No, sir.

**{¶96}** Q. And you claim you were so drunk you nearly fell down the stairs; right?

**{¶97}** A. Yes, sir.

**{¶98}** Q. Despite that level of impairment you appear to have a pretty crystal clear memory about who was where and what they were doing, considering you were so drunk you could hardly walk down the stairs.

**{¶99}** A. That was - -

**{¶100}** Q. Agree?

{¶101}        A.  That was before.  I could remember where everyone was sitting there before.

{¶102}        Trial Transcript, Volume II at 303-305.

{¶103}        H.H. also testified that he was not clear headed when he was sitting on the swing and that he was already impaired at that point.  S.H. testified at trial that she saw H.H. drinking and that while he was fine at first, "he was getting drunker." Trial Transcript, Volume II at 185. She testified that she later found H.H. passed out on the ground in the bathroom and she helped him get up and he went to sleep on the bed in L.H.'s room. She testified that she recalled telling the Detective that H.H. was intoxicated. S.H. testified that appellant would stand up, lean on her and "get a little dizzy" and that he would hold onto things when he was walking.  Trial Transcript, Volume II at 207.  S.H. testified that H.H. was sitting down most of the time and that he would hold onto the porch railing when he stood. Celeste Prince testified that, during his forensic interview, H.H. "reported he had so much alcohol he couldn't walk, felt dizzy and didn't know what he was doing." Trial Transcript, Volume III at 593. Based on the foregoing, we find that there was sufficient evidence that H.H.'s ability to resist or consent was substantially impaired due to the alcohol that appellant provided to him.

{¶104}        Having found that there was sufficient evidence regarding vaginal penetration and that H.H.'s lack of ability to resist or consent, we find that the trial court did not err in overruling appellant's Motion for Judgment of Acquittal.

{¶105}        As is stated above, appellant also argues that her conviction for rape is against the manifest weight of the evidence.

{¶106} On review for manifest weight, the reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶107} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

{¶108} Appellant specifically argues that there was no physical evidence regarding the encounter between H.H. and appellant and that appellant denied being the perpetrator and asserted that she was the victim of sexual assault. Appellant points out that L.H. testified that he observed appellant crying when he and S.H. found appellant and H.H. Appellant further contends that H.H.'s testimony regarding the incident itself was unclear and contradictory and was contradicted by the testimony of others.

{¶109} However, upon review of the record as a whole, we find that H.H.'s account of being raped was clear and consistent. Because the report was made weeks

after the rape occurred, there would not have been physical evidence. H.H. told Detective Wilson that appellant had provided him with alcohol and then sexually assaulted him. H.H. also indicated the same during his forensic interview.   There was testimony from witnesses at trial that H.H. was intoxicated at the time of the incident. We find that the jury did not lose it way in convicting appellant of rape. The jury, as trier of fact, was in the best position to assess credibility and clearly found H.H.  and the witnesses who testified as to his intoxication to be  credible witnesses.

{¶110}        Appellant's first and second assignment of error are, therefore, overruled.

III

{¶111}        Appellant, in her third assignment of error, argues that the trial court committed plan error when it failed to declare a mistrial or issue a curative instruction sua sponte after the Prosecutor elicited testimony regarding appellant's pre-arrest silence.

{¶112}        During the trial in this case, Detective Wilson testified that after Deputy Wisecarver took his initial report in October, he attempted to follow up with appellant to question her about what had happened, but that appellant "wouldn't come in…. she told me that she and her husband would not be coming in, it was a big mess, and she didn't want anything further done." Trial Transcript, Volume III at 504. He testified that he left phone messages for appellant that were not returned and that, a few weeks later, on January 11, 2021, he called appellant's place of employment and appellant told him that she was not going to come in and did not want anything done. He testified that after the phone call, appellant never called him back to say that she wanted to continue

pursuing rape charges against H.H. Detective Wilson further testified that as he was continuing with his investigation, appellant indicated that she no longer wanted to cooperate with law enforcement. He testified that the last contact he had with appellant outside of court was in January of 2021 and that he had no idea why she ceased to cooperate or return his calls. Appellant's counsel did not object to this testimony about her pre-arrest silence and no curative instruction was given.

{¶113}    Because appellant failed to raise the issue in the trial court when it could have corrected any error, she has forfeited all but plain error for purposes of appeal. *State v. Marini*, 5th Dist. Tuscarawas No. 09-CA-6, 2009-Ohio-4633, ¶ 12; *State v. Beck*, 5th Dist. Ashland No. 21-COA-022, 2022-Ohio-2013, ¶ 15.

{¶114}    Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding an accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden to demonstrate plain error on the record, *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings," *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *Id.* The Ohio Supreme Court clarified in *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, that the accused is "required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id.* at ¶ 22, *citing*

*United States v. Dominguez Benitez*, 542 U.S. 74, 81–83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004).

{¶115}     We find no plain error in this case. In the case sub judice, there was testimony that up through January of 2021, Deputy Wilson was investigating a rape allegation against H.H. that appellant had filed with Deputy Wisecarver. Deputy Wilson testified that  after H.H. told him that appellant had provided him with alcohol and that he was intoxicated and had sex, appellant became a potential suspect. Deputy Wilson's testimony was admitted not to show pre-arrest silence, but to explain the course of the investigation and to explain that at the time, appellant was still a potential victim. Appellant's silence was during a time when she was a potential victim, not a suspect. Moreover, we find that there was sufficient evidence of appellant's guilt presented at trial and appellant has failed to show that there was a manifest miscarriage of justice or that the outcome of her trial could have been different had counsel objected or a curative instruction been given.

{¶116}     Appellant's third assignment of error is, therefore, overruled.

IV

{¶117}     Appellant, in her fourth assignment of error, maintains that she received ineffective assistance of trial counsel when counsel failed to either request a mistrial or a curative instruction following the testimony regarding her pre-arrest silence.

{¶118}     Our standard of review for ineffective assistance claims is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ohio adopted this standard in the case of *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). These cases require a two-pronged analysis in reviewing a claim for ineffective

assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. *Id.*

{¶119}     Trial counsel is entitled to a strong presumption all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 1998-Ohio-343, 693 N.E.2d 267. In addition, the United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, 538 N.E.2d 373, *quoting Strickland* at 697, 104 S.Ct. 2052. Even debatable trial tactics and strategies do not constitute ineffective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

{¶120}     As is discussed above, Detective Wilson's testimony was not to show appellant's pre-arrest silence, but to explain the course of the investigation. At the time of the silence, appellant was a potential victim, not a suspect. Moreover, we find that, upon our review of the record as a whole, we cannot say that but for counsel's alleged error, the outcome of the trial would have been different.  We find that appellant did not receive ineffective assistance of trial counsel.

{¶121}     Appellant's fourth assignment of error is, therefore, overruled.

{¶122}     Accordingly, the judgment of the Muskingum County Court of Common Pleas is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Wise, John, J. concur.